**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel.:   (310) 819-3481

John Rizio-Hamilton (admitted *pro hac vice*)
(johnr@blbglaw.com)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel.: (212) 554-1400

*Counsel for Lead Plaintiff*
*Louisiana Sheriffs' Pension & Relief Fund*
*and the proposed class*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SKYWORKS SOLUTIONS, INC. SECURITIES LITIGATION | Case No. 8:25-cv-00411-DOC-JDE <br><br> <u>CLASS ACTION</u> <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> DEMAND FOR JURY TRIAL |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .................................................................2

II.    JURISDICTION AND VENUE ............................................6

III.   THE PARTIES ....................................................................7

IV.    SUMMARY OF THE FRAUD ............................................8

    A.     Skyworks's Relationship With Apple Has Been Essential to the Company's Growth and Revenues ......................................8

    B.     The Lifecycle of iPhone Development ...............................12

    C.     In Late 2023 and Early 2024, Skyworks Misleads the Market That its Content Position in the iPhone 16 is Secure ..........16

    D.     Defendants Announce the Loss of 10% of Content in the iPhone 16, Causing Large Investor Losses ........................21

    E.     Skyworks Misleads Investors That its Content Position on the iPhone 17 is Secure ........................................................24

    F.     On February 5, 2025, Skyworks Announces the Loss of 20% to 25% of Content in the iPhone 17, and the Stock Price Plummets ......26

    G.     Skyworks's New CEO Confirms That the Company Has Not Been "Performing That Well" the Past Three Years .........31

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..................................33

    A.     False and Misleading Statements in Quarterly Earnings Calls and Investor Conferences ....................................................33

    B.     False and Misleading Statements in SEC Reports ...........39

VI.    LOSS CAUSATION ..........................................................41

VII.   ADDITIONAL ALLEGATIONS OF SCIENTER ..............42

VIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR .........49

IX.    PRESUMPTION OF RELIANCE ......................................50

X.     EXCHANGE ACT COUNTS .............................................51

    COUNT I .........................................................................51

        For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants) ........................51

COUNT II ...................................................................................................53

    For Violations of Section 20(a) of the Exchange Act (Against Defendants Griffin and Sennesael) ..............................................53

XI.   CLASS ACTION ALLEGATIONS ................................................................55

XII.  PRAYER FOR RELIEF ...............................................................................56

XIII. JURY DEMAND ........................................................................................57

Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Lead Plaintiff" or "Louisiana Sheriffs"), by and through its undersigned counsel ("Lead Counsel"), brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants Skyworks Solutions, Inc. ("Skyworks" or the "Company"), its former Chief Executive Officer ("CEO"), Liam K. Griffin ("Griffin"), and its former Chief Financial Officer ("CFO"), Kris Sennesael ("Sennesael" and, together with Skyworks, the "Defendants"). Lead Plaintiff brings this action on behalf of itself and all other similarly situated persons or entities who purchased or otherwise acquired Skyworks common stock between August 7, 2023 and February 5, 2025, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based upon Lead Counsel's investigation, which included review and analysis of, *inter alia*: (1) Skyworks's statements to investors, including those made in SEC filings, in press releases, at investor conferences, and on earnings calls; (2) research reports issued by securities and financial analysts concerning Skyworks; (3) interviews of former Skyworks employees; (4) economic analyses of securities movement and pricing data; and (5) publicly available information regarding Skyworks. Lead Counsel's investigation into the factual allegations contained in this Complaint is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for further investigation and discovery.

## I.    INTRODUCTION

1.    This securities fraud class action arises from Defendants' statements to investors concerning Skyworks's relationship with its largest customer, Apple, Inc. ("Apple"). In particular, Defendants misleadingly assured investors that Skyworks's content position in supplying chipset components to Apple for the iPhone was secure when they knew, or were deliberately reckless in not knowing, that it was not.

2.    Skyworks develops and manufactures semiconductor products for numerous applications. Skyworks's most profitable business segment is selling chip components to mobile phone manufacturers. The Company's primary customer is Apple. Since the inception of the iPhone in 2007, Skyworks has partnered with Apple to provide radio frequency ("RF") front-end modules for successive iPhone generations.

3.    Skyworks's sales of chipset components to Apple for the iPhone is fundamental to the Company's business and has only increased steadily over the years. While Skyworks has repeatedly told the market that it was focused on diversifying its product base to guard against its dependence on Apple, during the Class Period, the Company's percentage of revenue based on Apple sales reached (and in some quarters, exceeded) approximately 70% of its total reported revenue. Of that amount, nearly 85% of Skyworks's sales to Apple related to the iPhone.

4.    Given that Skyworks derived an enormous concentration of its revenue from sales to Apple, and that Defendants referred to Apple as Skyworks's "largest customer" and its "most important customer," analysts and other market participants were hyper focused on Skyworks's relationship with Apple and its ability to maintain and grow its content position in successive iPhone cycles. As set forth herein, analysts and market participants regularly inquired about Skyworks's relationship with Apple and its content position in quarterly earnings calls and investor conferences, as such information was essential in modeling Skyworks's revenue, growth, and target share price.

5.      Apple makes design decisions for the iPhone over a year in advance of the traditional iPhone launch date in September. A former Skyworks employee stated that Skyworks generally submitted its bids to Apple in March or April; that Apple made design decisions in or around June; and that Skyworks began production by September the year before launch. A former Apple employee corroborated that timeline, stating that Apple makes design decisions around eighteen months before launch, and that component manufacturers start the manufacturing process by "making their bits" and getting "stock together" approximately one year in advance of the next iPhone launch date.

6.      Yet, as analysts asked Defendants about the status of its content position with Apple between August 2023 and March 2024, Defendants reassured investors that Skyworks's content position was secure, when it was not—even after there were "an increasing number of conversations with investors" in the first calendar quarter of 2024 "suggesting that Skyworks may have lost a key socket to Qualcomm."

7.      For example, on January 30, 2024, Defendant Griffin responded to an analyst's question about "losing content at your largest customer in the second half" of 2024 by saying, "I think we have a great position with our largest customer" and that "[n]othing really is concerning on that point." And in March 2024, in response to a question as to why Skyworks was "quite hopeful on the content going up," Defendant Griffin reiterated "the larger customer definitely prefers the kind of things that we do, honestly."

8.      Market participants credited Defendants' assurances. For example, UBS Equities analysts referred to Skyworks in November 2023 as a "trusted supplier to AAPL" and accepted that Skyworks "can sustain ~10% Y/Y dollar content growth in future smartphone launches." Likewise, in several quarterly analyst reports prior to April 2024, Oppenheimer reiterated that Skyworks's iPhone "is secure gen/gen . . . in our view."

9.      Unfortunately for investors, Defendants' repeated statements that Skyworks's content position was secure were misleading.

10.     On April 30, 2024, Defendants were forced to belatedly disclose that Skyworks had lost approximately 10% of its content position for the upcoming iPhone 16 to a competitor, which analysts connected to Qualcomm Technologies, Inc. ("Qualcomm" or "QCOM"). Skyworks's share price declined by over $16 per share, or 15%, which analysts attributed to Skyworks's lost content position and its material impact on Skyworks's revenues in Fiscal Year ("FY") 2025.

11.     Even then, Defendants expressly denied that the news "might signal a move to a sort of multi-sourcing strategy" at Apple. In fact, in response to a direct question as to whether Apple's decision is "kind of more limited to one year or one socket," Defendant Griffin stated, "It's one year, one socket for sure." He further reassured investors that "we have eyes on that" and "we'll wrap it up." Multiple analysts accepted Defendants' explanation, finding any content issues to be "short term in nature" and "transitory."

12.     However, these issues were anything but "transitory." Behind the scenes, Skyworks continued to lose material portions of its Apple business. By spring 2024, the design cycle for the iPhone 17 began anew. In mid-June 2024, Broadcom Inc. ("Broadcom" or "AVGO") told market participants that it had gained two or three new content positions on the iPhone 17, which was scheduled to be released in September 2025. While Broadcom did not publicly name the particular chip components or identify the competitor from which it won the new content position, the disclosure shows that Apple was making content decisions for the iPhone 17 and communicating them to its suppliers—including Skyworks—by no later than June 2024, consistent with historical norms.

13.     Yet, when questioned in November 2024 about Skyworks's business with Apple, and whether Skyworks could win back content in 2025 and 2026 from Apple, Defendant Griffin once again touted that Skyworks has "a very good

partnership with our largest customers." He continued: "So that back and forth is *always* going our way."[1] And as late as January 8, 2025, Defendant Sennesael conveyed to investors that Skyworks faced "positive tailwinds from [its] Apple design process," that management "sees iP 15/16 [iPhone 15 and iPhone 16]"—years in which Skyworks lost iPhone content— as aberration years," and that management expected that content growth of approximately 10% over the next year.

14.    In actuality, the back and forth was *not* "always" going Skyworks's way, and there would be no 10% content growth, as Defendants Griffin and Sennesael confidently told the market. In February 2025, Skyworks was forced to report that it had lost approximately 20-25% of its content position in the upcoming iPhone 17, which would "start impacting our revenue in the fourth quarter of fiscal 2025 and throughout fiscal 2026."

15.    That same day, Skyworks announced that Defendant Griffin, a 23-year Skyworks veteran, whose "greatest strength was his relationship with Apple," would resign as CEO and Chair of the Board, effective February 17, 2025.

16.    Given Defendants' repeated reassurances, analysts reacted with astonishment to this news, immediately connecting Skyworks's content loss to Broadcom and downwardly revising Skyworks's FY 2025 expected revenue by hundreds of millions of dollars. Analysts called the "surprise content loss" "deeply disappointing," describing the loss of content to Broadcom as a "[n]ightmare [r]ealized."

17.    Skyworks's share price collapsed, falling by over $21 per share, or nearly 25%, in a single day on sharply increased trading volume, saddling investors with significant losses.

18.    Several weeks later, on March 15, 2025, Skyworks's new CEO, Phillip Brace, admitted that the Company's prior claims that it had secured content positions

---

[1] All emphasis added throughout unless otherwise noted.

based on superior performance were illusory, stating that in the last three years "it's been challenging because we haven't been performing that well." Further, and in contrast to contemporaneous Class Period statements about content wins, Mr. Brace said, "We lost the last game. We lost the game. We don't like it."

19.    At the next quarterly earnings call, on May 7, 2025, Defendant Sennesael, who had worked at Skyworks for nearly nine years, announced that he was departing from the Company, as well.

20.    All told, as a result of Defendants' misstatements, Skyworks's stock price fell from a price of approximately $110 at the outset of the Class Period to approximately $65 after the final corrective disclosure, causing investors to suffer large losses.

## II.    JURISDICTION AND VENUE

21.    This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act.

22.    This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

23.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391 (b) and (c). At all relevant times, Skyworks had its principal executive offices located in this District and conducts substantial business here. In addition, many of the acts alleged herein occurred in this District.

24.    In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III.    THE PARTIES

25.    Lead Plaintiff Louisiana Sheriffs is a multi-employer, defined benefit, governmental retirement plan providing retirement, disability and death benefits to approximately 20,000 active and retired employees of the Sheriffs' offices in all 64 Louisiana parishes. As set forth in the accompanying certification, Louisiana Sheriffs purchased shares of Skyworks common stock during the Class Period and suffered damages as a result of Defendants' misrepresentations and omissions.

26.    Defendant Skyworks develops and provides analog and mixed-signal semiconductor products and solutions for a variety of applications, including components for the iPhone.

27.    Skyworks's business with Apple, to which the Company refers publicly as its "largest customer," has comprised a majority of the Company's revenue since 2016. For example, in its latest Annual Report, filed with the SEC under Form 10-K on November 15, 2024, Skyworks reported that for fiscal year 2024, its partnership with Apple constituted **69%** of the Company's total revenue, and the iPhone represented around **85%** of the Company's revenue derived from Apple.

28.    During the Class Period, Skyworks's common stock traded on the NASDAQ exchange under the ticker symbol "SWKS." Skyworks is incorporated under the laws of the State of Delaware. The Company's principal place of business was Irvine, California.

29.    Defendant Griffin was Skyworks's CEO and President from May 11, 2016, until his resignation was announced on February 5, 2025, effective February 17, 2025. As CEO, Defendant Griffin was responsible for the Company's important strategic decisions and for the accuracy of its financial statements and other communications with investors. During the Class Period, Defendant Griffin reviewed, approved, and/or made the Company's public statements to investors, including its filings with the SEC, which he signed personally.

30.     Defendant Griffin joined Skyworks in 2001 as Senior Vice President of the Company's Sales & Marketing Division. In 2011, he was promoted to Executive Vice President & Corporate General Manager, and in 2014, he became President of Skyworks. Prior to joining Skyworks, Defendant Griffin served as Vice President of Worldwide Sales at Vectron International and held positions at AT&T's Microelectronics and Network Systems businesses.

31.     Like Defendant Griffin, Defendant Sennesael has substantial industry experience. Defendant Sennesael was Skyworks's CFO from August 2016 until his resignation was announced on May 7, 2025, effective June 2, 2025. As CFO, Defendant Sennesael shared responsibility with Defendant Griffin for the Company's important strategic decisions and for the accuracy of its financial statements and other communications with investors. Defendant Sennesael reviewed, approved, and/or made the Company's public statements to investors, including its filings with the SEC, which he signed personally.

32.     Prior to joining Skyworks, Defendant Sennesael served as CFO of Enphase Energy from September 2012 to August 2016; CFO of Standard Microsystems Corp. from January 2009 to August 2012; VP of Operations Finance of ON Semiconductor from June 2002 to March 2008; and CFO of Alcatel Microelectronics from September 2000 to June 2002.

## IV.    SUMMARY OF THE FRAUD

### A.    Skyworks's Relationship With Apple Has Been Essential to the Company's Growth and Revenues

33.     Beginning in 2007, Skyworks was selected by Apple to supply an RF component called a front-end module for the very first iPhone. The front-end module included the power amplifier and switch for the iPhone, which were used to enable effective wireless communication. Following the announcement that Skyworks would be the sole supplier of the front-end module for the first iPhone, Skyworks shares surged.

34.     After working together on the first iPhone, Skyworks continued to partner with Apple to supply RF components for multiple Apple applications, including tablets, desktop and notebook computers, and watches. Sales stemming from Skyworks's involvement on iPhones and other Apple products were the key driver of revenue for the Company. Skyworks's revenue increased from $773.7 million in fiscal year 2006 (the year before the launch of the iPhone) to $5.485 billion in fiscal year 2022.

35.     Over time, Skyworks became increasingly more dependent on its relationship with Apple, as Apple became Skyworks's self-described "largest customer," its "most important customer," and its most essential source of income. From 2017 to 2024, Skyworks's reported percentage of revenue from aggregate sales to Apple steadily rose, while its total percentage of revenue earned from relationships with other customers steadily declined.

| Percentage and Dollar Amount of Skyworks's Overall Net Revenue from Apple between 2017-2024 | | |
| --- | --- | --- |
| Year | Percentage | Dollar Amount (Billions) |
| 2017 | 39% | $1.424 |
| 2018 | 47% | $1.817 |
| 2019 | 51% | $1.722 |
| 2020 | 56% | $1.879 |
| 2021 | 59% | $3.014 |
| 2022 | 58% | $3.181 |
| 2023 | 66% | $3.149 |
| 2024 | 69% | $2.882 |

36.     Even as Skyworks repeatedly touted its strategy of diversifying content to other customers, analysts consistently highlighted the importance of Apple to

Skyworks's financial performance, as the Company's success was tied to growing—or at least maintaining—its content position with Apple.

37.    For example, in August 2023, a Morningstar Equity analyst wrote that "Skyworks earns the majority of its revenue from mobile products, mostly from a variety of products that switch, filter, and amplify wireless signals in smartphone"; that "the company has significant customer concentration with Apple (about 59% of fiscal 2022 revenue), and it would be a catastrophic blow to Skyworks if it were to ever miss out on a future iPhone design cycle"; and that although Skyworks "has seen robust growth from these end markets, we suspect that its fortunes will remain tied to the wireless industry for quite some time." In November 2023, Wolfe Research stated that in the future "the handset business is increasingly appearing to be a source of cash" and that Skyworks's success is "dependent on what management is able to do with the cash generated from the iPhone business." Also in November 2023, Goldman Sachs stated that "while we recognize Skyworks's ongoing focus on diversifying its business portfolio, customer concentration remains the highest in our coverage universe with the company's largest customer accounting for 66% of FY23 revenue, up from 58% in FY22."

38.    Internally, Skyworks employees recognized that the Company's lack of diversification was problematic. Former Employee ("FE") 1 worked as a Program Management Support-Pre-Production Expeditor at Skyworks's facilities in Newbury Park, CA, from April 2015 to March 2023, and in Austin, TX, from March 2023 to September 2023. In that capacity, FE 1 specialized in inventory, supply planning, and program management regarding Apple and Samsung products. FE 1 supported all of Skyworks's program managers ("PMs") regarding all aspects of the production process, including meeting with Apple representatives.

39.    FE 1 participated in multiple Company meetings in which Griffin and other Skyworks executives stressed the need for Skyworks to diversify its product base given the Company's heavy reliance on Apple for most of its revenue. FE 1

stated that Defendant Griffin hosted quarterly meetings with Skyworks employees. These meetings were also recorded for employees to later review. FE 1 recalled that Defendant Griffin regularly discussed in those meetings the need for Skyworks to diversify its portfolio beyond Apple, which was reflected in the accompanying meeting slide deck. FE 1 elaborated that there was always talk among Skyworks employees that it would be difficult for Skyworks to sustain growth if it did not diversify into product offerings beyond Apple.

40.    Apple also implemented a sourcing policy requiring the dual-sourcing of chip components when possible. FE 1 recalled that FE 1 learned in Company meetings (including in meetings that FE 1 attended with Apple representatives) that Apple would seek to preclude any particular supplier of iPhone components, when possible, from having more than 50% of the business for a particular product line. According to FE 1, that policy was different than what existed over the course of the Apple/Skyworks relationship. FE 1 confirmed that FE 1 knew by at least March 2023 that Apple was no longer going to be single sourcing certain chip components from Skyworks for the iPhone 16.

41.    According to FE 1, this move away from single sourcing was a product of COVID-19 supply chain disruptions. During the COVID-19 pandemic, Skyworks faced serious supply chain disruptions, exacerbated in part by the fact that Skyworks itself single sourced many of its own components. For example, pre-pandemic, Skyworks sourced its wafers—a necessary component within front-end modules— from its internal Newbury Park, California manufacturing location for assembly Skyworks's factory in Mexicali, Mexico.

42.    In the midst of the pandemic, FE 1 recalled that Skyworks's Newbury Park and Mexicali locations were shut down, impacting Skyworks's ability to complete product assembly for iPhones with the front-end module. FE 1 recalled that after this incident, Apple dictated that Skyworks could no longer single source products used for Apple—i.e., Skyworks would be required to both manufacture and

source components from multiple locations. However, FE 1 recalled that Skyworks was limited in where it could manufacture since it had planned to close the manufacturing piece of the Woburn, Massachusetts location.

43.    Even beyond the supply chain disruptions, FE 1 indicated that as early as 2020, Skyworks's employees learned that Apple decided that it was going to take some of its manufacturing in house, which could negatively impact Skyworks in the future.

**B.    The Lifecycle of iPhone Development**

44.    As referenced in ¶¶ 2 and 33, Apple released the first iPhone in the U.S. on June 29, 2007.

45.    Each year since then, Apple has released successive iterations of the iPhone with updated technological capabilities. These releases now typically occur in September of each relevant year. For example, Apple released the latest iPhone models, the iPhone 16 and the iPhone16 Plus, on September 20, 2024.

46.    Apple sources numerous iPhone components from outside global manufacturers and suppliers, such as Skyworks. Some of the products outsourced by Apple include the components relating to the memory board, RF board, and logic board, which are composed of a range of different processors, circuits, amplifiers, and other chips from several different companies. As noted above, Skyworks provides Apple with components within the RF board, including the front-end module.

47.    Broadcom and Qualcomm also supply Apple with components for iPhones, including RF components, and are among Skyworks's largest competitors.

48.    Apple takes between two and three years to develop an iPhone, from proof of concept to retail. A 2020 *Wall Street Journal* article stated that Apple's head of hardware technologies "dictates years ahead of time the features in Apple's chips that power future devices." That same article reported that Apple's "insourcing" of products (i.e., developing its own chips and components) "can give Apple ***a two-***

*year jump* on competitors in device performance because Apple can plan how multiple chips work together to limit power consumption and free up space inside iPhones and iPads for other components."

49.    According to FE 1, Skyworks participated in Apple's "down selection" process to bid on iPhone components. FE 1 explained that Skyworks spent approximately two years building up to the bidding and selection process for the iPhone, often producing between 10-12 versions of the part that it would ultimately submit to Apple for testing. Skyworks also knew at the time of bidding which of its competitors would be bidding for particular components, which the Company considered in making bidding decisions.

50.    The down selection process usually occurred in April (or sometimes March) of the year preceding the introduction of a new iPhone model. For example, for an iPhone being launched in September 2025, the down selection process would generally take place in April 2024.

51.    FE 1 recalled that Apple made final design decisions in or around May or June in the year preceding the iPhone launch (e.g., in May or June 2024 for an iPhone launch in 2025). FE 1's timeline matches information reported by analysts regarding the iPhone 17, due to launch in September 2025. As set forth in ¶ 12, analysts reported in June 2024 that Broadcom had achieved new content wins for the iPhone 17—nearly eight months before Skyworks revealed content losses relating to the iPhone 17, and fifteen months before the release of the iPhone 17.

52.    Historically, FE 1 recalled that Apple was more willing to work with Skyworks to make quality adjustments to outperform a competitor. That changed, however, post-pandemic and after Apple's shift in policy toward dual-sourcing chipset components.

53.    After FE 1 learned about bidding decisions by June, FE 1 would learn in site-level program management meetings about which PMs would be assigned to production and where Skyworks would manufacture and assemble the product. That

is, by June or so, FE 1 and the program management team would know what products Skyworks won in the bidding process, as well as whether components would be dual-sourced.

54.     FE 1 stated that production would generally begin 2-3 months after Apple made its bidding decisions, in or around August or September (e.g., in August or September 2024 in advance of an iPhone release in September 2025), so long as there are no additional modifications forthcoming. Any larger builds would be handled by Skyworks's Mexicali facility. FE 1 recalled that Skyworks would send certain manufactured components parts to Apple in the January timeframe so that Apple may begin its production.

55.     A former Apple employee further corroborates this timeline. The AlphaSense Expert Insights platform published a transcribed interview on May 19, 2025 between an analyst and a former Apple employee who identified himself as a Carrier Account Manager who worked at Apple from September 2015 through May 2023 and managed Apple's relationship with a large group of Tier 1 carriers in Europe and the United Kingdom. The former Apple manager, who acted as a point person for issues related to those cell carriers, stated that he and his team "would do all the new product introduction" and that they would "engage with the Tier 1 carriers pre-launch to explain what their new devices were, explain what the baseband was, some of the issues that we may have been having, and some of the things we needed them to do for us." The Carrier Account Manager stated that component manufacturers begin building their components approximately one year out from launch:

> ***If you have to suddenly make any changes there, you're a year out from launch, and you've already locked the design down. You're getting the manufacturers making their bits, trying to get some stock together.*** It's a very bursty, slow process, it goes crazy, but the planning behind it is years in the making. Certainly, with some suppliers, when you're developing, for instance, the face ID technology, ***Apple's working with that supplier for multiple years, leading up to it being***

***included in a product.*** Again, these are long-term strategic relationships with partners Apple trusts, and changing a lot of that is going to be massively challenging.

He later estimated that some of the design lockdown occurs up to "18-19 months in advance" of the iPhone model launch.

56.     Thus, manufacturers turn in their samples and bid for an opportunity to be a component supplier over sixteen months prior to the next iPhone cycle. Apple thereafter decides who will be the supplier and whether those components will be single or dual sourced (i.e., how many suppliers per component). After making supplier decisions, Apple notifies each bidder of the decision and, if a bidder is not selected, they will be made aware of the company Apple ultimately chose to supply the product. Thereafter, component suppliers begin the manufacturing process.

57.     Subsequently, Apple begins its early production process, known as New Product Introduction ("NPI"), before engaging in mass-production. NPI involves design validation and prototype testing, supplier qualification and manufacturing process development, and pilot production runs, meaning the phones are built in some quantity over a year prior to mass-production.

58.     For example, *PC Magazine* reported in early-January 2023 that the NPI process had begun on the iPhone 15, meaning that "there's an actual production line running for the new smartphone, with the aim being to discover any problems with the assembly, spot potential efficiency gains, and identify ways to save on manufacturing costs/time before the inevitable shift to mass production."

59.     A former Skyworks employee, FE 2, confirmed this manufacturing timeline. FE 2 is a former employee who worked as a Senior Supply Chain Manager at Skyworks's facilities in Mexicali, Mexico from 2017 to January 2023. In that capacity, FE 2 was responsible for the planning and procurement of manufacturing at the Mexicali facility. FE 2 also managed outsource services (planning, procurement, and deliveries) in the Asia Pacific Region. FE 2 confirmed that the

manufacturing element of the NPI process, including mass product sourcing and supply chain management, began in early-January of the year of the release. He believes that wafer production likely would have begun in Newbury Park sometime before production began in Mexicali in early January.

60.     Thus, published articles and interviews with former Apple and Skyworks employees establish that Apple makes iPhone design decisions in or around the summer prior to the iPhone launch in September of the following year, and that such design decisions are "locked in" before the manufacturing process begins up to one year prior to launch.

61.     Given that Apple design decisions were communicated to Skyworks in or around June of the year preceding the next September iPhone launch, Defendants certainly knew, or were deliberately reckless in not knowing, that Skyworks had lost a material content position in the iPhone 16 before Defendants made statements in August 2023, November 2023, January 2024, and March 2024 indicating otherwise.

## C.    In Late 2023 and Early 2024, Skyworks Misleads the Market That its Content Position in the iPhone 16 is Secure

62.     On September 11, 2023, Qualcomm announced that it had entered into an agreement with Apple to supply Snapdragon 5G Modem-RF Systems for iPhones launched in 2024 (i.e., the iPhone 16), 2025 (the iPhone 17), and 2026 (the iPhone 18). Upon news of the agreement, analysts reported on Qualcomm's favorable position with Apple, and the likelihood that Qualcomm would retain its modem position in the iPhone 16 and successive models so long as Apple failed to develop and implement its own modem for the iPhone.

63.     This posed a threat to Skyworks because analysts had long focused on the possibility that Qualcomm could leverage its position as Apple's primary modem supplier to "bundle"—i.e., sell in tandem for an overall lower price than its competitors—the modem and other chipset components, such as RF components, to Apple. The market raised this possibility, and Defendants repeatedly downplayed it.

64.    For example, at a June 2022 Bank of America Global Technologies Conference, an analyst asked Defendant Griffin a question about Qualcomm, stating,

> There's a very large customer, right, in the RF industry, right, that has the ability to bundle a lot of other components, right, modems and transceivers and then so forth. Do you think that has become a much bigger threat for Skyworks than in the past?

Defendant Griffin responded,

> No, it's the same threat. It's in fact, I think, less of a threat because the complexity right now – the modem is the modem. There's one modem in every device, and there's not six, okay. What we're seeing in advanced 5G and moving to the next nodes, more complexity, more challenge, current consumption budgets that are scaring the engineers in the customers' side, and they're looking for help, how can we – it's Skyworks, you guys need to help us. This is different than it was last year. This is a different node. So, we actually – we thrive on that.

The analyst followed-up on Qualcomm, asking,

> If you look at their growth rates, right, over the last year, they have been 30%, 40%, 50%, so a lot higher, right, than the other players in the industry. So, doesn't that mathematically say that they are gaining a lot of share in the market?

Again, Defendant Griffin responded: "Well, no, I don't see them as gaining a lot of share," and "there hasn't been anything that has taken away our ability to execute and grow."

65.    During Skyworks's earnings call on August 7, 2023, in response to a question about "what percentage of revenue came from your largest customer," Defendant Sennesael answered: ***"[W]e continue to win big with that large customer. And as you indicate, yes, we win with that customer not just at the phone but in every product that they have and every product that they brought to the market and that they will bring to the future."***

66.    On September 9, 2023, Goldman Sachs reported on its Communacopia + Technology Conference 2023, in which Defendant Sennesael

participated. The ensuing Goldman Sachs analyst note identified as a "Key Takeaway" Skyworks's "near-term business outlook and position at largest customer," stating that, regarding Skyworks's largest smartphone customer, Defendant Sennesael "emphasized that a) *the companies' relationship remains strong*, b) the rate of annual RF content growth on a through-cycle basis *is unchanged at ~10%*, and c) *any significant uptick in content that might be implied in its nearest competitor's near-term revenue outlook is not coming at the expense of Skyworks*."

67.    While Defendants stressed to the market that "we continue to win big with that large customer" and that "we win" "in every product that they have and every product that they brought to the market and that they will bring to the future," Defendants had not maintained the same level of content for the iPhone 16 as in prior models.

68.    In contrast, Qualcomm told the market that it expected to gain a content position for the upcoming year. On November 28, 2023, Akash Palkhiwala, Qualcomm's Chief Financial Officer, spoke at the UBS Technology, Media & Telecom Conference. At that conference, a UBS analyst asked Mr. Palkhiwala "what's driving [Qualcomm's] slightly more optimistic view *next year* versus this year?" In response, Mr. Palkhiwala stated,

> [W]e already know the next 2 or 3 chips we are doing. And we expect this 10-ish percent increase in content at the minimum as we look forward.

69.    Still, Defendants continued to drive the perception that Skyworks's content position was secure. In a meeting with Oppenheimer analysts at the Consumer Electronics Show ("CES") on or around January 11, 2024, Defendant Sennesael and other Skyworks managers conveyed the "strength of content across Mobile and Broad Markets." Oppenheimer concluded, based on their meeting with Defendant Sennesael, that "Mgmt. is bullish on RF content growth of ~10%/year

going forward . . . ." According to Oppenheimer, "content expansion is key in the mature handset segment."

70.     On January 30, 2024, after reporting its financial results for the first quarter fiscal year of 2024, Defendants Griffin and Sennesael hosted another earnings call with analysts. During the call, Skyworks **doubled down** on claims that there was nothing to worry about with its relationship with Apple.

71.     In response to a direct question regarding **whether Skyworks "may be losing content at your largest customer in the second half of the year"** and "how you're feeling content-wise with that largest customer," Defendant Griffin stated,

> *I think we have a great position with our largest customer. Nothing really is concerning on that point, and we know exactly who we are and who they are, and we have great partnerships. And we'll continue to drive success*.

72.     Defendants continued to downplay any threats. On March 5, 2024, Defendant Griffin participated in the Morgan Stanley Technology, Media & Telecom Conference on behalf of Skyworks. During the conference, a speaker asked Defendant Griffin the following question:

> **Question:** Sure. Like it sounds like calendar 2023, iPhone 15 was maybe a little disappointing in part because you noted they didn't – they kept the Qualcomm modem. They're going to keep it for iPhone 16. Unclear on iPhone 17, but you're quite hopeful on the content going up a lot more alongside an Apple modem. Why is that? Is that strictly because Apple will move away from RF, from Qualcomm or will they move just add more content in total?

73.     To this question, Defendant Griffin provided an unhedged response that Apple "definitely prefers the kind of things that we do," that any "contracts and IP agreements" are "going to get resolved," and that there is "nothing that we really can't handle":

> Yeah, no, those are good, I can't answer all those, unfortunately, but *what I would say is, I don't want to be too controversial about it, but the larger customer definitely prefers the kind of things that we do, honestly*. *No one really likes to deal with contracts and agreements*

*and this and that.* That's not what people want. They want really good product, reliable. They want a company that if something goes wrong. You're right on it the next day, we're not into the IP wars. I mean, you got to do what you do as a public company. But yeah, it's been a little choppy in the last year or so, but it's kind of all get – *it's all going to get resolved, I mean, contracts and IP agreements and all that stuff. At the end of the day, the products matter. The satisfaction to the consumer matters a lot and we'll be fine with it*. But those kind of little things are going [to] happen and they happen in all industries. But yeah, certainly, there's definitely a couple of things that are flipping and flopping there. *But, nothing that we really can't handle.*

74.     Analysts were comforted by Skyworks's repeated denials that it faced any risk of content loss on the upcoming iPhone cycle and, as a result, identified Skyworks's content position as secured and sustainable.

75.     For example, on November 3, 2023, a UBS Research analyst noted that while "TTM content growth at AAPL seems to be flattening in the near-term as competition appears to be intensifying," "SWKS remains a trusted supplier to AAPL and we think SWKS can sustain ~10% Y/Y dollar content growth in future smartphone launches." Likewise, in October 2023, an analyst at Morningstar Equity commented that although it was "modestly concerned about the firm's customer concentration with Apple," "Skyworks' supplier relationship with Apple appears secure to us." In quarterly updates issued in August and November 2023 and in January 2024, an Oppenheimer report noted that Skyworks's iPhone "is secure gen/gen, in our view." And in a report issued on April 29, 2024, the day before Skyworks's earnings call in which it announced a 10% loss in content position in the upcoming iPhone 16 cycle, a Barclay's analyst wrote: "The risk here is that the company talks about a larger socket loss during the [earnings] call, but we don't see that happening . . . ."

**D.    Defendants Announce the Loss of 10% of Content in the iPhone 16, Causing Large Investor Losses**

76.    Investors began to partially learn the truth regarding Skyworks's misleading statements that its iPhone 16 content was secure when Skyworks announced its financial results for the Second Fiscal Quarter 2024 on April 30, 2024.

77.    On the subsequent earnings call with analysts, Defendants Griffin and Sennesael announced that Skyworks expected "our mobile business to be down sequentially, below normal seasonal patterns, as excess inventory clears."

78.    An analyst thereafter asked about the reasons for the expected decrease in mobile business revenues, including any impact "for the second half of the year" and "expected content in programs that would launch later in the year[.]" Defendants Griffin and Sennesael confirmed that Skyworks had lost approximately 10% of its content position with "our largest customer":

> **Liam Griffin:** So, there's interesting dynamics here, and I really can't comment on specifics related to our largest customer. However, we will provide as much directional color as possible here. So, we were placed in a unique situation with our largest customer, where we were unable to consummate an award that we expected, and frankly, thought we had earned. As a result, ***we expect content headwinds from the upcoming cycle.*** At the same time, we are strategically aligned with our largest customer, and we're ready to engage in all of their strategic initiatives going forward.

> **Kris Sennesael:** Yeah. And Matt, just to add a little bit more color there, and again, we – as you know, we can't really go into the specifics as it relates to the large customer. But we were able to partially offset the socket loss that Liam [Griffin] just talked about it with some additional content gains, including some new sockets that we don't have in the current version of the phone. And so, as a result, on a net-net, ***we expect the content to be down a little more than 10% compared to the current phone model, and that will start having an impact in the September quarter.***

79.     When asked whether the news "might signal a move to sort of multi-sourcing strategy at that customer [Apple], where they're looking to bring in additional suppliers across all sockets just for supplier diversity reasons," or whether "it's kind of more limited to one year or one socket?," Defendant Griffin answered categorically, ***"It's one year, one socket for sure. And we have very, very good eyes on that."***

80.     Skyworks's stock price plummeted on the news, dropping from a price of $106.59 per share at market close on April 30, 2024, to $91.07 at market open on May 1, 2024. The stock price closed at $90.30 per share at market close—a decline of $16.29 per share from the previous day, or approximately 15%. Trading volume on May 1, 2024 (9,095,600 shares) was significantly higher than on April 30, 2024 (3,594,100 shares).

81.     Analysts attributed the news to Skyworks's disclosure about its lost content position to Qualcomm.

82.     For example, on May 1, 2024, Susquehanna Financial stated,

During the course of the quarter, we had an increasing number of conversations with investors suggesting that Skyworks may have lost a key socket to Qualcomm. We believe Apple's internal modem development plans have missed key milestones, pushing out the timetable for vertical integration. This push naturally puts QCOM in the catbird seat for future negotiations with Apple. We believe it's likely that QCOM asked for the socket as a concession and was awarded such.

83.     Likewise, a BNP Paribas analyst report entitled "The Good, The Bad And The Ugly," explained that it believed "Qualcomm continues to influence socket placements while it dominates the baseband modem at Apple, which was 68% of sales in the MarQ." BNP Paribas stated that while "[h]eadwinds facing the smartphone industry have mostly abated," the "problem" is that "Skyworks' content is challenged through the iPhone 16 cycle more than offset stability in the premium handset market."

84.     A Wolfe Research analyst report stated that Skyworks experienced a
"[d]isappointing outlook driven by inventory build at largest handset customer and
content loss on that customer's 2024 flagship phone," highlighting that "content loss
on that customer's 2024 flagship (we believe to QCOM), which will cause about a
10% reduction in content for the next product cycle." As a result, Wolfe Research
stated that "our estimates for F25 now reflect 4 years of consecutive y/ y mobile
revenue declines, with the last driver of y/y growth being iPhone 12 (the first 5G
iPhone)."

85.     And an Oppenheimer analyst report, entitled "Smaller Bite of the
Apple," noted that "Mgmt estimates SWKS lost >10% content in upcoming iPh16."
The "[r]educed content combined with iPhone units expected down >5% this year
paves a bumpy road to 2024 growth." Oppenheimer estimated that Skyworks's
content was "down 10% to ~$11.50 in upcoming iPh16."

86.     Analysts, however, also credited Defendants' statements that the
content loss was transitory and limited to "one year, one socket."

87.     For example, a Wells Fargo analyst report highlighted Skyworks's
"upcoming content loss at largest customer," referring to it as a "modest (~10%)
content loss in an upcoming AAPL upcoming refresh (duration of content loss may
be one generation)." Piper Sandler stated that it believed that "SWKS is undergoing
headwinds in mobile demand which we think is short term in nature," and that "the
mobile business is being impacted by share movement as well as downward pressure
in units in the near term." Argus stated that while Skyworks suffered content losses,
"the company continues to engage strongly with Apple." Wolfe Research reported
that Skyworks's management believed the iPhone content loss "to be a somewhat
transitory issue specific to iPhone 16 rather than an ongoing overhang." UBS
Equities stated that the share losses "may prove to be a clearing of the decks around
apple content and we are optimistic these headwinds start to lift as Apple starts to
roll its own modem through the product line." And Morningstar Equity reported that

despite the content loss, "Skyworks' supplier relationship with Apple appears secure" and not "part of a slippery slope where Qualcomm will fully supplant Skyworks," but rather, "Skyworks will still have significant content in the iPhone 16 series, and we assume healthy content in future iPhones, as well."

### E.    Skyworks Misleads Investors That its Content Position on the iPhone 17 is Secure

88.    Skyworks's material content losses associated with the iPhone 16 placed additional pressure on the Company to maintain and grow its content position in the upcoming iPhone 17 cycle, particularly since Defendants represented that any content loss associated with the iPhone 16 was temporary in nature.

89.    Consistent with Apple's typical release schedule, the iPhone 17 was reported to release on or around mid-September, 2025. By June 2024, however, news began to emerge that Apple had made certain design decisions for the iPhone 17.

90.    In June 2024, several analysts reported that Broadcom, which had existing content positions within the iPhone but not the specific RF components manufactured by Skyworks, had won a new content position on the iPhone 17.

91.    For example, on June 13, 2024, Goldman Sachs stated that "Broadcom highlighted a new socket win in Wireless segment at its main North American customer, and expects content gains to drive yoy (%) growth in FY25/26 in excess of unit growth *at its largest North American customer*."

92.    Oppenheimer also reported on June 13, 2024, that "AVGO won new RF content in iPhone17 next year."

93.    Neither Broadcom nor the analysts identified the specific component that Broadcom had won in the iPhone 17, or that Broadcom had won content at Skyworks's expense.

94.    As with the iPhone 16 content cycle, Defendants continued to insist that its content position with Apple was secure.

95.    In an earnings call on November 12, 2024, Defendant Griffin told investors that Skyworks was "in the early stages" of a "multiyear trend" regarding a "transformative smartphone upgrade cycle," and that "Skyworks is well positioned to capitalize on it."

96.    Analysts also asked Defendant Griffin point blank whether Skyworks was positioned to win back content in 2025 and 2026, to which Defendant Griffin unequivocally responded,

> I'm sure as you know, we have a very good partnership with our largest customers. **So that back and forth is always going our way.**

97.    Defendant Griffin further referenced "the road map that we're putting forward," stating that "we have the scale, we have the people, we have the ambition to make it happen, and most important, **we have the confidence of our most important customer**."

98.    Through early-2025, Defendants continued to assert not only that the Company's content position was secure, but that it would actually grow by approximately 10%. For example, on January 8, 2025, Oppenheimer issued an analyst note regarding a "sit down" with Defendant Sennesael and Skyworks Vice President of Investor Relations, Raji Gill, at the Consumer Electronics Show ("CES"). During the meeting, Defendant Sennesael and Mr. Gill "**highlighted positive tailwinds from Apple design process** and strength of broad markets portfolio." Oppenheimer reported that:

> **Mgmt sees iP 15/16 [iPhone 15 and iPhone 16] as aberration years**. Apple has historically requested RF suppliers to redesign components on every iPhone model, from iP1 to iP14. However, in iP15/iP16, Apple prioritized design and integration of its internal baseband. This resulted in reuse of SWKS components originally design for iP14 in the iP15, along with ASP [average selling price] erosion. Internal baseband was expected in iP16. When this didn't materialize, QCOM took some RF content through bundling, leading to 10% SWKS content loss.

99.     According to Oppenheimer, "Apple is expected to follow its historical trend of using redesigned RF components for iP17." Defendant Sennesael relayed that "***Mgmt sees content [Average Selling Price] back to historical average 10%/year growth*** led by more frequency and satellite bands, carrier aggregation, MIMO, and WiFi/GTS."

100.    That same day, J.P. Morgan reported that it hosted an investor group meeting at the CES with Defendant Sennesael and Gill. Based on that meeting, J.P. Morgan stated that Skyworks had a ***"Strong iPhone opportunity and return to 10% average RF content growth[:]"***

> After two years of RF content decline at Apple (iPhone 15 and iPhone 16) due to Apple's focus on internal modem development along with some content loss, ***we believe the team is poised to return to its historical average content growth of 10% at Apple.*** This is as Apple refocuses on the annual cadence of redesigning its RF components. AI-enabled smartphones are driving higher RF requirements and smaller packaging form factors, which should lead to an ASP uplift. Indeed, the iPhone 17 RF components will be redesigned, contributing to an ASP uplift. In the longer term, the team believes that Apple's shift to internal modems, as opposed to dual-tracked model phones, should allow SWKS to free up R&D resources. These resources could be reinvested in RF to compete in more sockets or in the broad markets.

101.    Thus, heading into Skyworks's earnings call on February 5, 2025, Defendants had repeatedly told the market that its content position in the iPhone 17 was secure, and that sales would return to historical content averages of 10% per year growth.

### F.    On February 5, 2025, Skyworks Announces the Loss of 20% to 25% of Content in the iPhone 17, and the Stock Price Plummets

102.    On February 5, 2025, when Skyworks hosted a conference call with analysts after market close to discuss its first quarter fiscal 2025 results and business outlook. Skyworks disclosed two new pieces of information that left investors stunned.

103.   During that conference call, Defendant Griffin announced that he would be resigning from the Company effective February 17, 2025.

104.   Defendant Sennesael thereafter described how Skyworks's content position in the upcoming Apple iPhone cycle (the iPhone 17) was "expected to be down 20% to 25%," which would "start impacting our revenue in the fourth quarter of fiscal 2025 and throughout fiscal 2026":

> As it relates to the upcoming phone cycle, expected to be launched in the fall of 2025, the Skyworks team developed a suite of high-performance RF solutions. Despite our rich product offering, we did not get the result that we targeted. Although we were able to secure multiple sockets, including several highly integrated RF modules, ***our content position is expected to be down 20% to 25%.*** This decline will start impacting our revenue in the fourth quarter of fiscal 2025 and throughout fiscal 2026.

105.   In response to an analyst's question about the content losses, Defendant Sennesael stated that Skyworks,

> [U]nfortunately . . . didn't really get what we targeted. And a part of that is most of the sockets that we targeted, we actually were able to keep but instead of being single sourced on one particular socket, ***it's being dual sourced. And that's a little bit of a setback.***

106.   In a follow-up answer, Defendant Sennesael confirmed that Skyworks was "sharing a socket" that it did not share last year, that "[w]e were dual sourced on one important part":

> And the customer is asking. The customer is demanding and asking for better and higher RF products, in part because, as you all know, they're bringing AI capabilities to the phone, which is increasing the technological burden inside the phone. They're asking for smaller footprint, lower power consumption, lower latency and higher throughput and overall higher performance and we are stepping up. We demonstrated that our technology and products can do it. Unfortunately, right, we didn't get a single source. We were dual sourced on one important part.

107.    When another analyst asked Defendant Sennesael for "just a little more clarity on the down 20% to 25%," Defendant Sennesael responded that "the content loss is really a result of the share loss" that "accounts for all of it" as "we lost share as we moved from single-source to dual-source."

108.    In addition, Defendant Sennesael confirmed that Skyworks would not "win back" the sockets lost to Qualcomm in connection with the "Qualcomm modem":

> So again, I can't really go into the specifics, but we've indicated that *it's unlikely or impossible that we win back those sockets as it relates to the Qualcomm modem, but we've done well as it relates to the internal modem. And maybe last point, we – so we indicated a range of 20% to 25%. The reason of that is because we are dual sourced*.

109.    Finally, Defendant Sennesael acknowledged that in the prior quarter Skyworks's sales to Apple comprised "72% of [the Company's] total revenue," and that "85% of that revenue is related to the phone."

110.    Skyworks's stock price plummeted on the news, dropping from a price of $87.08 per share at market close on February 5, 2025, to $62.55 at market open on February 6, 2025. The stock price closed at $65.60 per share at market close—a decline of $21.48 per share from the previous day, or approximately 25%. Trading volume on February 6, 2025 (19,998,500 shares) was significantly higher than on February 5, 2025 (5,345,500 shares).

111.    Given Defendants' consistently reassuring statements, analysts were shocked by the disclosure of additional iPhone lost content.

112.    A Wolfe Research analyst called the Skyworks news "deeply disappointing," claiming that:

> What was relevant was not near term results, but their disclosure that they would lose on the order of 20-25% content on this year's iPhone. Considering that AAPL represents 75% of SWKS revenue, and this [is] the second consecutive year of significant content decline, it's a troubling development. In what's not likely to be a coincidence,

SWKS's CEO is stepping down, to be replaced by Philip Brace (formerly the CEO of Sierra Wireless).

113.    Wolfe Research also connected the dots between Broadcom's prior announcement months earlier and the specific component lost by Skyworks in the upcoming iPhone 17 cycle:

> We had previous concerns regarding SWKS content losses in the receive portion of iPhone - something that AVGO had hinted about in the summer when they noted "content gains in an area they had not previously participated." We believe that starting with iPhone 17, SWKS will share some of that content with (we believe) AVGO, resulting in a 20-25% content reduction.

114.    A J.P. Morgan analyst report referenced Skyworks's "significant content loss for upcoming iPhone 17 cycle," which would be a "share loss for the upcoming iPhone 17 cycle, resulting in a 20-25% content loss compared to the iPhone 16." The report stated "that this high value socket, historically single-sourced by Skyworks, will be dual-sourced for the iPhone 17." J.P. Morgan estimated an "average content loss of $2.50 to $3.0 and the total revenue impact to be about ~$400-$450." J.P. Morgan further decreased its price target by $30 from $100 to $70.

115.    Like Wolfe Research, J.P. Morgan connected the content loss to Broadcom's prior statements in June 2024 about "potential share gains":

> ***We believe Broadcom potentially gained share in this socket (we believe transmit diversity module) given the $$ content of the socket combined with Broadcom's prior comments on potential share gains in 2025 on a module that the company hasn't previously supplied***.

116.    A Susquehanna Financial analyst report referred to Skyworks's ***"Nightmare Realized,"*** stating that "Skyworks' better results and guidance were overshadowed by management announcing a -20-25% YOY content loss in the iPhone 17 as talk that Apple dual tracked the diversity receive appear to have materialized (split with Broadcom who is likely getting majority share)."

117.   A Barclays analyst stated that the "Hammer DrxOps"—referring to the component that Skyworks lost in the iPhone 17—and that Skyworks "confirms partial socket loss in the IP17 and guides blended content down 20-25% Y/Y due to multi-sourcing of the DRx with AVGO (now largest ASP part), while simultaneously announcing a CEO change." Barclays dropped its earnings estimate for 2025 by $220 million for FY25 and by $300 million for FY26. Barclays also lowered its SKWS price target by 21%, down to $55 per share.

118.   An analyst for Raymond James and CGS International described **Skyworks's "iPhone Content Surprise,"** stating that while Skyworks's quarterly earnings were "largely in line," the "bigger story" was "management's comment regarding share loss at its largest customer (Apple ~69% of sales) in 2H25 models. Management expects 20-25% content decline due to Apple's decision to dual-source a key RF component in iPhone 17."

119.   A Goldman Sachs analyst stated that "SWKS is indicated -23% in after-hour trading following the company's disclosure regarding a **material loss in RF dollar content (i.e. 20-25% on a gen-to-gen basis)** in this year's flagship phone from its lead customer." The analyst listed as its top concern:

> Content loss at largest customer: **the largest surprise in the quarter came in management's admission that, despite securing multiple RF sockets (including several highly integrated RF modules), Skyworks had lost 20-25% in RF dollar content in their lead customer's flagship phone scheduled to launch in the fall of 2025.**

As a result, Goldman Sachs reduced its earnings per share estimates by approximately 30% and its 12-month price target from $92 to $70. Goldman also reduced its CY2025/26/27 revenue estimates by 8%/14%/15%, respectively "as we reflect the content loss at Skyworks' largest customer."

120.   Similarly, a BofA Global Research analyst report entitled **"No quick fix for surprise content loss,"** lowered BofA's price objective from $88 to $60 per share. The report stated that "we see no quick way for SWKS to recover from its surprise

20-25% content loss at largest customer Apple (72% of sales), in upcoming (Fall'26) version of the iPhone (17). We believe SWKS will share that content (Diversity Receive modules part of radio frequency section) with AVGO."

121.    A KeyBanc Capital Markets analyst report stated that Skyworks's "iPhone 17 valley [is] deeper than expected due to **surprise loss of TX DRX socket**." KeyBanc stated that it was "lowering ests" as a result of the **"significant share loss in iPhone 17."** KeyBanc decreased its FY2025 and 2026 revenue estimates by approximately $207 million and $654 million, respectively.

122.    A BNP Paribas analyst report referred to Skyworks's earnings results as a **"surprise"** and lowered its target price from $80 per share to $68 per share. BNP Paribas stated that the "content loss in the iPhone 17 is a major headwind to Skyworks' revenue and margin potential, particularly given that Apple represents 72% of total sales."

### G.    Skyworks's New CEO Confirms That the Company Has Not Been "Performing That Well" the Past Three Years

123.    Contrary to public statements made by Defendants over the Class Period, including their numerous statements that Skyworks would not lose its content position with Apple, Skyworks's new CEO, Phillip Brace, admitted shortly after joining Skyworks that **the Company had not been "performing that well" the past three years**.

124.    On March 5, 2025, Mr. Brace spoke at the Morgan Stanley Technology, Media & Telecom Conference. During the conference, Mr. Brace had the following interaction with the host analyst, in which he confirmed Skyworks's poor multi-year performance:

> **<u>Question – Joe Moore:</u>** Revisit the bad neighborhood thing because I feel like for a decade, Skyworks did really well and grew – and content per phone grew every year. And, yeah, the concentration weighed on the multiple. **And then you had – the last three years has been really painful, for sure.** But it seems like the zero sum part to me feels a little bit negative because it does seem like content is still growing.

**Answer – Philip G. Brace**: Yeah. I mean, I guess the bad neighborhood, I'm glad you brought that up. I mean, look, it's the neighborhood we're in. It's competitive. It's challenging. I mean, okay. I mean, *it's been challenging because we haven't been performing that well.* I mean, honestly, if we had been rising our content, if we'd been growing our content, and we're at $13 or $14 or $15 promoter-wise and growing about – I mean, that could be totally different, right? *It's a bad neighborhood because we haven't been performing that well in it.*

125.    Mr. Brace further acknowledged that Skyworks did not deliver the "best product":

**Question – Joe Moore**: That makes a lot of sense. So, you mentioned the disruption at a key customer. And you're a few days in, so I don't want to put you on the spot too much, but how do you think about mending those fences and getting back to where you want to be?

**Answer – Philip G. Brace:** For better or worse, I mean, they are the best customer in the world to have. If you didn't have a customer like that, everybody – the conversation I'd be having here with you is, why don't you have them? I mean, they demand excellence in everything. They demand excellence in performance, they demand excellence in cost, and they demand excellence in operational execution. *And you may not like it, but that's the game we play. And the rules are clear. You deliver the best product, you win. You have a jump ball, you split. And you deliver a crappy product, and you lose.*

*And so in the particular case, we delivered a jump ball. We didn't lose. We delivered a jump ball. And as a jump ball, they're going to split . . . .*

126.    Mr. Brace continued: *"We lost the last game. We lost the game. We don't like it."* He also conceded that Skyworks was not "as focused as we could've been" and had become "too complacent."

127.    These admissions by Mr. Brace on behalf of the Company contradicted the numerous, unhedged statements of Defendants Griffin and Sennesael, touting, among other things, Skyworks's "outstanding" execution, its customer engagement and satisfaction, and its lack of any concerns regarding its relationship with Apple—

including that "nothing really is concerning" as to Skyworks's relationship with Apple, that Apple "definitely prefers the kind of things that we do," and that the "back-and-forth" between Apple and Skyworks "is always going our way"—as keys to the Company's promised content growth of 10% per year.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.   False and Misleading Statements in Quarterly Earnings Calls and Investor Conferences

**<u>August 7, 2023</u>**

128.   After market close on August 7, 2023, Skyworks reported its financial results for the Third Quarter Fiscal Year 2023. In an earnings call that day, and in response to a question from another analyst about Skyworks's revenues from Apple, Defendant Sennesael responded: "[W]e continue to win big with that large customer. And as you indicate, yes, we win with that customer not just at the phone but in every product that they have and every product that they brought to the market and that they will bring to the future."

129.   The above statements in ¶¶ 65, 67, and 128 were materially false and/or misleading. As of the date of the alleged misstatement, it was materially misleading to tell investors that "we continue to win big with that large customer," Apple, and that "we win with that customer . . . in every product that they have and every product that they every product that they brought to the market and that they will bring to the future," when the Company had lost a material portion of its content position to Qualcomm. At minimum, it was deliberately reckless for Defendants to portray Skyworks's content position as secure when Skyworks had not, in fact, been awarded the same content position on the iPhone 16 as it had obtained in prior models.

**November 2, 2023**

130. After market close on November 2, 2023, Skyworks reported its financial results for the Fourth Quarter Fiscal Year 2023.

131. In an earnings call that same day, in response to an analyst question regarding inventory correction and the prospects for "shipping to actual real consumption," Defendant Griffin answered, ***"In the mobile business we absolutely know where the dollars are and where the opportunities are, and we have eyes on all that, and we'll continue to drive that portfolio very strong."***

132. Defendant Griffin also fielded a question about Skyworks's historical "10% annual content increases," and whether "looking into the next year, do you think you can grow content another 10%?" He responded: ***"Our teams together are executing in an outstanding way, and we're committed to growth and diversification and certainly matching the challenges with our top tier customers."***

133. The above statements in ¶¶ 131-32 were materially false and/or misleading. As of the date of the alleged misstatement, Defendants Griffin and Skyworks knew or were deliberately reckless in not knowing that Skyworks had lost a material content position in the iPhone, which would impact the Company's revenue and growth. Thus, it was materially misleading to tell investors that the Company "absolutely know[s] where the dollars are" in the mobile business, that the Company would "continue to drive that portfolio very strong," and that Skyworks was "executing in an outstanding way" and "committed to growth and diversification and certainly matching the challenges with our top tier customers," which suggested to investors that Apple had already made content positions that were positive for Skyworks. At minimum, it was deliberately reckless for Defendants to portray Skyworks's content position as secure when Skyworks had not, in fact, been awarded the same content position on the iPhone 16 as it had obtained in prior models.

**January 30, 2024**

134.   After market close on January 30, 2024, Skyworks reported its financial results for the First Quarter Fiscal Year 2024.

135.   In an earnings call that day with analysts, Defendant Griffin made statements about Skyworks's relationship with its largest customer, Apple, including that Skyworks was "poised to return to growth when the markets recover," and that Company "remain[s] bullish on the long-term RF content story in smartphones coupled with growing 5G penetration."

136.   Further, in response to a direct question regarding *whether Skyworks "may be losing content at your largest customer in the second half of the year"* and "how you're feeling content-wise with that largest customer," Defendant Griffin responded:

> *I think we have a great position with our largest customer. Nothing really is concerning on that point, and we know exactly who we are and who they are, and we have great partnerships. And we'll continue to drive success.*

137.   The above statements in ¶¶ 135-36 were materially false and/or misleading. As of the date of the alleged misstatement, Skyworks had lost a material content position in the iPhone, which would impact the Company's revenue and growth. It was therefore materially misleading to tell investors that "nothing" was "concerning" regarding Skyworks's relationship with Apple. At minimum, it was deliberately reckless for Defendants to portray Skyworks's content position as secure when Skyworks had not, in fact, been awarded the same content position on the iPhone 16 as it had obtained in prior models.

**March 5, 2024**

138.   On March 5, 2024, Defendant Griffin participated in the Morgan Stanley Technology, Media & Telecom Conference. During the conference, a speaker asked Defendant Griffin the following question about Skyworks's content position in the iPhone:

**Question – Unidentified speaker:** Sure. Like it sounds like calendar 2023, iPhone 15 was maybe a little disappointing in part because you noted they didn't – they kept the Qualcomm modem. They're going to keep it for iPhone 16. Unclear on iPhone 17, but you're quite hopeful on the content going up a lot more alongside an Apple modem. Why is that? Is that strictly because Apple will move away from RF, from Qualcomm or will they move just add more content in total?

**Answer – Liam K. Griffin:** Yeah, no, those are good, I can't answer all those, unfortunately, but what I would say is, ***I don't want to be too controversial about it, but the larger customer definitely prefers the kind of things that we do, honestly. No one really likes to deal with contracts and agreements and this and that.*** That's not what people want. They want really good product, reliable. They want a company that if something goes wrong. You're right on it the next day, we're not into the IP wars. I mean, you got to do what you do as a public company. But yeah, it's been a little choppy in the last year or so, but it's kind of all get – it's all going to get resolved, I mean, contracts and IP agreements and all that stuff.

***At the end of the day, the products matter. The satisfaction to the consumer matters a lot and we'll be fine with it.*** But those kind of little things are going happen and they happen in all industries. But yeah, certainly, there's definitely a couple of things that are flipping and flopping there. ***But, nothing that we really can't handle.***

139.   The above statement in ¶ 138 was materially false and/or misleading. As of the date of the alleged misstatement, Skyworks had lost a material content position in the iPhone 16, which would impact the Company's revenue and growth. It was therefore materially misleading to tell investors that Skyworks's "larger customer definitely prefers the kind of things that we do," and that there was "nothing that we really can't handle," which suggested to investors that Apple had already made content decisions that were positive for Skyworks. At minimum, it was deliberately reckless for Defendants to portray Skyworks's content position as secure when Skyworks had not, in fact, been awarded the same content position on the iPhone 16 as it had obtained in prior models, and, in fact, its content position was at serious risk of loss to Qualcomm.

**November 12, 2024**

140.  On November 12, 2024, Skyworks reported Fourth Quarter 2024 financial results. During the earnings call that same day, an analyst asked about the Company's relationship with Apple and its ability to win back content in 2025 and 2026. Defendant Griffin responded:

> We got an incredible technology bench, we have the scale, we have the physical plant, and we have the flexibility to do what our customers need. And I'm sure as you know, ***we have a very good partnership with our largest customers. So that back and forth is always going our way.***

Defendant Griffin further stated that "we have the scale, we have the people, we have the ambition to make it happen, and most important, ***we have the confidence of our most important customer***."

141.  The above statements in ¶ 140 were materially false and/or misleading. As of the date of the alleged misstatement, Defendants Griffin and Skyworks knew Skyworks's content position in the iPhone 17 was not secure because Skyworks had lost a material content position to Broadcom. It was thus materially misleading to state that the "back and forth" between Skyworks and Apple "is always going our way," and that Skyworks has "the confidence of our most important customer." At minimum, it was deliberately reckless for Defendants to portray Skyworks's content position as secure when Skyworks had not, in fact, been awarded the same content position on the iPhone 17 as it had obtained in prior models.

**January 8, 2025**

142.  On January 8, 2025, Oppenheimer published an analyst note regarding a "sit down" with Defendant Sennesael and Skyworks Vice President of Investor Relations, Raji Gill, at the Consumer Electronics Show ("CES"). According to Oppenheimer, Defendant Sennesael "***highlighted positive tailwinds from Apple design process*** and strength of broad markets portfolio." Oppenheimer reported that:

> ***Mgmt sees iP 15/16 [iPhone 15 and iPhone 16] as aberration years.*** Apple has historically requested RF suppliers to redesign components

on every iPhone model, from iP1 to iP14. However, in iP15/iP16, Apple prioritized design and integration of its internal baseband. This resulted in reuse of SWKS components originally design[ed] for iP14 in the iP15, along with ASP [average selling price] erosion. Internal baseband was expected in iP16. When this didn't materialize, QCOM took some RF content through bundling, leading to 10% SWKS content loss.

143.   Oppenheimer also stated: "Apple is expected to follow its historical trend of using redesigned RF components for iP17," and that "***Mgmt sees content ASP [Average Selling Price] back to historical average 10%/year growth*** led by more frequency and satellite bands, carrier aggregation, MIMO, and WiFi/GTS."

144.   The above statements in ¶¶ 142-43 were materially false and/or misleading. As of the date of the alleged misstatement, Defendants Sennesael and Skyworks knew Skyworks's content position in the iPhone 17 was not secure because Skyworks had lost a material content position to Broadcom. It was thus materially misleading to state that there were "positive tailwinds from Apple design process," that "Mgmt sees iP15/16 as aberration years," and that "Mgmt sees content [Average Selling Price] back to historical average 10%/year growth." At minimum, it was deliberately reckless for Defendants to portray Skyworks's content position as secure when Skyworks had not, in fact, been awarded the same content position on the iPhone 17 as it had obtained in prior models.

145.   Also on January 8, 2025, J.P. Morgan reported that it hosted an investor group meeting at the CES with Defendant Sennesael and Gill. Based on that meeting, J.P. Morgan stated that ***Skyworks had a "Strong iPhone opportunity and return to 10% average RF content growth[:]"*** "After two years of RF content decline at Apple (iPhone 15 and iPhone 16) due to Apple's focus on internal modem development along with some content loss, we believe the team is poised to return to its historical average content growth of 10% at Apple."

146.   The above statement in ¶ 145 were materially false and/or misleading. As of the date of the alleged misstatement, Defendants Sennesael and Skyworks

knew Skyworks's content position in the iPhone 17 was not secure because Skyworks had lost a material content position to Broadcom. It was thus materially misleading to tout the "strong iPhone opportunity" and convey that Skyworks was poised to return to its historical average content growth of 10% at Apple. At minimum, it was deliberately reckless for Defendants to portray Skyworks's content position as secure when Skyworks had not, in fact, been awarded the same content position on the iPhone 17 as it had obtained in prior models.

**B.    False and Misleading Statements in SEC Reports**

147.    During the Class Period, Defendants knowingly or recklessly made materially false and misleading statements concerning the business risks facing Skyworks, including the statements set forth below.

148.    On November 17, 2023, Skyworks filed its annual report on Form 10-K for the fiscal year ended September 29, 2023 with the SEC (the "2023 Form 10-K"), which was signed by Defendants Griffin and Sennesael, among others, and made available on Skyworks's investor relations website.

149.    On November 15, 2024, Skyworks filed its annual report on Form 10-K for the fiscal year ended September 27, 2024 with the SEC (the "2024 Form 10-K"), which was signed by Defendants Griffin and Sennesael, among others, and made available on Skyworks's investor relations website.

150.    Skyworks 2023 Form 10-K and 2024 Form 10-K included the same statements concerning risks facing the Company, including:

(a)    "Significant portions of our sales are concentrated among a limited number of customers," and that "*[i]f* we lost one or more of these major customers, or *if* one or more major customers significantly decreased its orders for our products, . . . our business, results of operations, and financial condition *could be* materially and adversely impacted, which could adversely affect our stock price";

(b)     "The wireless communications semiconductor industry, in general, and the other analog markets in which we compete are very competitive, which *may* cause . . . rapid loss of market share"; and

(c)     "Current and potential competitors have established, or ***may*** in the future establish, financial or strategic relationships among themselves or with customers, resellers, or other third parties. These relationships *may* affect customers' purchasing decisions. Accordingly, it is ***possible*** that new competitors or alliances among competitors could emerge, causing such competitors to rapidly acquire significant market share. We *may* not be able to compete successfully against current and potential competitors. Increased competition could result in pricing pressures, decreased gross margins, and loss of revenue and market share and *may* materially and adversely affect our business, results of operations, and financial condition."

151.   The risk factor statements quoted in ¶ 150, *supra*, were repeated or incorporated by reference into Skyworks other reports on Forms 10-K and 10-Q that the Company filed with the SEC during the Class Period, including its quarterly report filed on January 30, 2024 (the "1Q17 10-Q"), which was signed by Defendants Griffin and Sennesael, among others, and made available on Skyworks's investor relations website.

152.   The risk factor statements set forth in ¶¶ 150(a)-(c), *supra*, were materially false and misleading when they were made because the risks portrayed as hypothetical or potential had in fact already materialized as detailed herein. For instance:

(a)     Defendants did not disclose the fact that Skyworks had already lost material content positions to Qualcomm and later Broadcom;

(b)     Defendants misleadingly presented the potential for market share losses as merely a hypothetical risk; and

(c)     Defendants created the false impression that Skyworks had not suffered design or content losses.

## VI.    LOSS CAUSATION

153.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. Throughout the Class Period, Skyworks's stock price was artificially inflated because of Defendants' materially false and misleading statements that created false impressions concerning Skyworks's position with its largest customer, Apple. As a result of Defendants' materially false and misleading statements and omissions, the market price of Skyworks's common stock was inflated throughout the Class Period.

154.    The artificial inflation in Skyworks's stock price was removed when the facts and conditions concealed from investors by Defendants' material misstatements and omissions were revealed to the market and/or materialized on: (1) April 30, 2024, when Skyworks announced that its largest customer, Apple, had reduced Skyworks's content position in the upcoming iPhone 16 cycle by approximately 10%; and (2) on February 5, 2025, when Skyworks reported that its largest customer, Apple, had reduced Skyworks's content position in the upcoming iPhone 17 cycle by an additional 20-25%.

155.    *First*, on April 30, 2024, Skyworks announced that the Company had lost approximately 10% of its content position in the upcoming iPhone 16 cycle.

156.    On this news, the price of Skyworks's common stock declined by $16.29 per share, or approximately 15% from a closing price of $106.59 per share on April 30, 2024, to a closing price of $90.30 per share on May 1, 2025.

157.    As described in detail in ¶¶ 80-87, analysts attributed the drop in Skyworks's stock price to its announcement regarding the Company's loss of a material content position in the upcoming iPhone cycle.

158.    *Second*, on February 5, 2025, Skyworks reported that its content position in the upcoming Apple iPhone 17 cycle was "expected to be down 20% to 25%," which would "start impacting our revenue in the fourth quarter of fiscal 2025 and throughout fiscal 2026." Skyworks revealed that it lost content because Apple

had decided to dual-source an RF component, and that the existing Skyworks product failed to outperform its competitor. These disclosures further revealed the truth about Skyworks's growth and revenue prospects, its actual relationship with Apple, and the actual demand for Skyworks's components.

159.    In response to this news, Skyworks's common stock declined by $21.48 per share, or nearly 25%, from a closing price of $87.08 per share at market close on February 5, 2025, to a closing price of $65.60 on February 6, 2025.

160.    As described in detail in ¶¶ 110-22, analysts attributed the drop in Skyworks's stock price to its announcement regarding the Company's loss of a material content position in the upcoming iPhone cycle.

161.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Skyworks's common stock. It was also foreseeable to Defendants that the revelation of the truth that they concealed would cause the price of the Company's common stock to decline as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## VII.  ADDITIONAL ALLEGATIONS OF SCIENTER

162.    A host of additional facts, in addition to those discussed above, support a strong inference that Defendants knew, or at minimum were deliberately reckless in not knowing, that Skyworks had lost or was poised to lose content with Apple.

163.    *First*, Defendants made statements about Skyworks's secure content position with Apple when they knew, or were deliberately reckless in not knowing, Skyworks had lost material market share to competitors Qualcomm and Broadcom.

164.    As set forth *supra* ¶ 51, Apple made content decisions in the summer prior to the September launch of a new iPhone model. That is consistent with analysts reporting in June 2024 that Broadcom had secured a new content position

on the iPhone 17 to be launched in September 2025, a fact that would have been disclosed to Defendants because Skyworks was one of the companies bidding on the component part.

165. Yet, despite this timeline, Defendants repeatedly represented to investors that Skyworks would maintain and grow its content with Apple. For example, Defendant Griffin told investors on November 12, 2024 that the "back and forth is always going our way" with Apple and that "we have the confidence of our most important customer." Likewise, on or about January 8, 2025, Defendant Sennesael conveyed to analysts that Skyworks would achieve "positive tailwinds from [its] Apple design process," that management "sees iP 15/16 [iPhone 15 and iPhone 16] as aberration years," and that management expected that content growth would return back to its historical average of 10% growth.

166. Defendants Griffin and Sennesael thus possessed facts directly contradicting their public statements that Skyworks would maintain or grow its Apple iPhone content position.

167. **Second**, Skyworks's relationship with Apple was the key to the Company's business, and it would be implausible to assume that its highest level executives, who spoke about this relationship in every interaction with analysts during the Class Period, were not aware of any related material updates.

168. For example, the AlphaSense Expert Insights platform published a transcribed interview on July 5, 2023 between an AlphaSense analyst and Peter L. Gammel. Mr. Gammel worked as Skyworks's General Manager and Vice President of Engineering from December 2011 through January 2013, and as Skyworks's Chief Technology Officer from January 2013 through November 2019. After leaving Skyworks, he became the Chief Technology Officer at GlobalFoundries Inc., a chip wafer manufacturer that is "a major supplier to Skyworks in terms of their future technology, and they obviously are still very involved with the Skyworks community through that time." He is currently the Chief Executive Officer of Ubilite. During

his tenure with Skyworks, Mr. Gammel "managed the WiFi business" and then, as CTO, was responsible for the Company's "technology roadmap, customer interactions with regard to [the] technology roadmap," and "industry vision[.]" As CTO, Mr. Gammel "sat in the boardroom[.]" According to Mr. Gammel, the responsibility of Skyworks's CEO is to "always protect[] and defend[] *the core business,"* which means "[y]ou're taking care of Apple."

169.   As outlined above, losing Apple's core business was an existential threat to Skyworks. Apple's relationship with Skyworks constituted up to *72%* of the Company's overall revenue during the Class Period. Additionally, for years, on numerous occasions, Defendants Griffin and Sennesael touted the importance of Apple to Skyworks, referring to it consistently as its "largest customer" and its "most important customer."

170.   For example, at the March 2024 Morgan Stanley Technology, Media & Telecom Conference, Defendant Griffin stated that the relationship with its largest customer "shoulder to shoulder is *very, very important*," and in a November 12, 2024 earnings call, Defendant Griffin reassured that "we have the confidence of *our most important customer*."

171.   Given that Apple was Skyworks's "largest customer" and its *"most important customer,"* Defendants undoubtedly knew, or were deliberately reckless in not knowing about the status of design wins for the iPhone and whether Skyworks's content position was actually secure, all of which would directly and materially impact the Company's revenue and growth.

172.   The fact that selling chipset components to Apple was a core operation of Skyworks and was crucial to the Company's revenue and growth—and that Defendants touted its importance and the Company's focus on it—supports a strong inference of the Defendants' scienter with respect to their misleading statements on the subject. At the very least, given the Defendants' intimate knowledge of Skyworks's sales to Apple, it was deliberately reckless not to investigate the

accuracy of their unequivocal statements regarding the Company's content position with Apple before making them to the market.

173.    **Third**, Defendants held themselves out as knowledgeable about content engagement and Skyworks's ability to maintain and grow content with its largest customer, Apple, and they specifically denied any concerns about losing content.

174.    As detailed above, Defendants spoke regularly to investors and securities analysts about the importance of the Company's relationship with Apple and its ability to continue to achieve content gains, professing to know what they were speaking about.

175.    Namely, throughout the Class Period, Defendants demonstrated specific familiarity with the overall competitive landscape in the semiconductor industry, the specific nuances of Skyworks's relationship with Apple, including the "unique" "commercial issues" and "interesting dynamics" within the partnership, and Skyworks's mobile business and ability to achieve growth. *See* ¶ 78.

176.    Defendant Griffin was the CEO of Skyworks and Defendant Sennesael was the CFO of Skyworks. Each Defendant was intimately involved in Skyworks's overall performance.

177.    Of particular note, it was well-established that Defendant Griffin had a close relationship with Apple, such that he would be made immediately aware of any changes in business.

178.    For example, Mr. Gammel, who worked directly with Defendant Griffin at Skyworks at the executive level, stated in his transcribed interview with AlphaSense that Defendant Griffin's "greatest strength is his relationship with Apple, just deep, long-term personal ties with Apple that will never go away." He stated further that Defendant Griffin is "a highly competitive person with those long-term relations to Apple."

179.   On a November 12, 2024 earnings call, Defendant Griffin himself boasted that Skyworks's "very good partnership" with Apple involved a "back and forth [that] is always going our way."

180.   Defendants also held themselves out as having contemporaneous knowledge of Apple's component selection process, all of which suggested to the market that Defendants knew that its content position with Apple was secure. For example, Defendants told investors that:

- Skyworks would "continue to win big with that large customer" and that "yes, we win with that customer not just at the phone but in every product";

- that "we absolutely know where the dollars are and where the opportunities are, and we have eyes on all that, and we'll continue to drive that portfolio very strong";

- that "we have a great position with our largest customer" and that "[n]othing really is concerning on that point"; and

- that "we have a very good partnership with our largest customers. So that back and forth is always going our way."

181.   These statements suggested to the market that Defendants had contemporaneous knowledge of the current status of the iPhone content decisions and that Skyworks's content position with Apple was secure.

182.   Further, as FE 1 recounted, Defendant Griffin regularly presented to Company employees in quarterly meetings, in which he provided detailed information about Skyworks's main customers and competitors, as well as the specific components on which Skyworks had won or lost in the bidding process. As stated *supra* ¶39, FE 1 stated that Defendant Griffin regularly communicated to employees in the slide decks that Skyworks needed to diversify its portfolio.

183.   FE 1 stressed that Griffin was the primary source of Company information for its employees, including issues regarding the chipset bidding and

manufacturing process. FE 1 stated that the monthly and weekly production meetings in which FE 1 participated would at times incorporate and build upon slides and other information presented by Griffin.

184.   The fact that Defendants held themselves out as knowledgeable about their content position and strong relationship with Apple and discussed these subjects in detail with investors and securities analysts, including numerous contemporaneous statements that there were no concerns about the Skyworks/Apple relationship, supports a strong inference of their scienter.

185.   Given all these statements, either Defendants knew the representations they provided about Skyworks's content position and status with Apple so often were false and misleading or, at minimum, they were deliberately reckless in not finding out the truth.

186.   ***Fourth***, analysts were particularly focused on Skyworks's relationship with Apple and its content position in the iPhone, and they credited Defendants' statements about the strength of that relationship.

187.   For example, after Defendants announced on the April 30, 2024 Earnings Call that Skyworks had lost a material content position on the iPhone 16, Defendant Griffin reassured investors that "[w]e are partners with our largest customer," that "[w]e expect to do more work in the future and [are] looking forward to that," and that "we are strategically aligned with our largest customer, and we're ready to engage in all of their strategic initiatives going forward," analysts fully credited these statements. Piper Sandler, Argus, and UBS all parroted these sentiments, emphasizing that the mobile business headwinds were "short term in nature" and that "the company continues to engage strongly with Apple," and expressing optimism that the headwinds would "start to lift as Apple starts to roll its own modem through the product line." *See supra* ¶ 87.

188.    When Defendants finally disclosed the truth that the Company had lost material content positions to Apple, analysts adjusted revenue estimates by hundreds of millions of dollars and slashed Skyworks's target stock price.

189.    Knowing that analysts and investors were intensely focused on Skyworks's relationship with Apple, and given how closely analysts tracked Defendants' public statements about Skyworks's content position with Apple, it was at minimum deliberately reckless for Defendants to make unequivocal statements suggesting that Skyworks had maintained its content position in the iPhone.

190.    **Fifth**, the magnitude and significance of the misstatements supports scienter.

191.    Given that Apple was Skyworks's "largest" and "most important" customer, any material change in the nature of that relationship could impact hundreds of millions of dollars in revenue and growth. Indeed, following the dates of each corrective disclosure on April 30, 2024, and February 5, 2025, in which Skyworks's revealed content losses of 10% and 20-25% respectively, analysts modeled hundreds of millions of dollars in future lost revenues and material decreases in Skyworks's target share price.

192.    Misstatements of this magnitude do not occur by happenstance or in the dark; they are the product of intentional or, at minimum deliberately reckless conduct.

193.    **Sixth**, the timing and circumstances surrounding the unexpected departure of Defendants, shortly after the revelation of the alleged fraud, further supports an inference of scienter.

194.    The same day the fraud was revealed—February 5, 2025—the Company announced the unexpected departure of its CEO, Defendant Griffin. Defendant Griffin had worked for Skyworks for nearly 23 years, was responsible for overseeing Skyworks's operations across the globe, and had repeatedly touted Skyworks's content position with Apple as secure. Similarly, Skyworks's longtime

CFO, Defendant Sennesael, announced his departure from the Company on the subsequent earnings call on May 7, 2025. Defendant Sennesael had worked for Skyworks for approximately 9 years and was responsible for overseeing the Company's financial operations across the globe.

195. Analysts connected the departures of Defendants Griffin and Sennesael to the significant content decline at Apple. For example, a Wolfe Research analyst reporting on the loss of content noted that, "[i]n what's not likely to be a coincidence, SWKS's CEO is stepping down." Likewise, a Morningstar Equity analyst reported Skyworks's "material 20%-25% reduction in radio frequency chip content per Apple iPhone within the iPhone 17 series," and that "[p]erhaps relatedly, Chairman and CEO Liam Griffin will step aside." BNP Paribas referred to Defendant Sennesael's departure as a "personnel change" made by Skyworks. And UBS stated that "SWKS's CFO is departing and this is usually not viewed favorably by investors."

196. That both Defendants departed the Company shortly after the Company revealed that its prior statements about Skyworks's content position were misleading furthers a strong inference of scienter.

## VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR

197. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint. The misstatements complained of herein were historical statements or statements of purportedly current facts and conditions existing at the time or prior to when the statements were made.

198. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above (*see* Section V, *supra*), then-existing facts contradicted Defendants' statements regarding, among other things, Skyworks's content position with Apple.

1  Given the then-existing facts contradicting Defendants' statements, any generalized
2  risk disclosure made by Defendants was insufficient to insulate Defendants from
3  liability from their materially untrue and misleading statements.

4      199.  Alternatively, to the extent the statutory safe harbor otherwise would
5  apply to any forward-looking statements pleaded herein, Defendants are liable for
6  those forward-looking statements because at the time each of those statements was
7  made, the particular speaker knew that the particular forward-looking statement was
8  false or misleading, and the statement was authorized or approved by an executive
9  officer of Skyworks who knew that the statement was false or misleading when
10  made.

11  **IX.  PRESUMPTION OF RELIANCE**

12      200.  The Class is entitled to a presumption of reliance on Defendants'
13  material misrepresentations and omissions pursuant to the fraud-on-the-market
14  doctrine because, at all relevant times, the market for Skyworks's common stock was
15  efficient for the following reasons, among others:

16      201.  Skyworks's stock met the requirements for listing, and was listed and
17  actively traded on the NASDAQ exchange, a highly efficient and automated market;

18      202.  Skyworks's common stock traded at high weekly volumes;

19      203.  As a regulated issuer, Skyworks filed periodic reports with the SEC;

20      204.  Skyworks was eligible to file registration statements with the SEC on
21  Form S-3;

22      205.  Skyworks regularly communicated with public investors via
23  established market communication mechanisms, including through regular
24  dissemination of press releases on the national circuits of major newswire services
25  and through other wide-ranging public disclosures, such as communications with the
26  financial press, securities analysts, and other similar reporting services;

27      206.  Skyworks was followed by numerous securities analysts employed by
28  major brokerage firms who wrote reports which were distributed to those brokerage

firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace;

207.  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Skyworks securities; and

208.  Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired Skyworks common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

209.  As a result of the foregoing, the market for Skyworks's common stock reasonably promptly digested current information regarding Skyworks from all publicly available sources and reflected such information in the price of Skyworks's common stock. All purchasers of Skyworks common stock during the Class Period suffered similar injury through their purchase of Skyworks common stock at artificially inflated prices, and a presumption of reliance applies.

210.  A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X.    EXCHANGE ACT COUNTS

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

211.  Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

212.  This Count is asserted on behalf of all members of the Class against Skyworks and Defendants Griffin and Sennesael for violations of Section 10(b) of

the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

213.  During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew were, or they deliberately disregarded as, false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

214.  Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

215.  Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Skyworks's relationship with its largest customer, Apple; (b) artificially inflate and maintain the market price of Skyworks common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Skyworks common stock at artificially inflated prices and suffer losses when the true facts became known.

216.  Skyworks and Defendants Griffin and Sennesael are liable for all materially false and misleading statements they made during the Class Period, as alleged above.

217.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Skyworks stock, were either known to the Defendants or were so obvious that the Defendants were deliberately reckless in not knowing them.

218.    Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Skyworks common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiff and the Class would not have purchased Skyworks common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially misleading statements.

219.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Skyworks common stock during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act (Against Defendants Griffin and Sennesael)**

220.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

221.    This count is asserted on behalf of all members of the Class against Defendants Griffin and Sennesael for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

222.    Defendants Griffin and Sennesael acted as controlling persons of Skyworks within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

223.   By reasons of their high-level positions of control and authority as the Company's most senior officers, Defendants Griffin and Sennesael had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Defendants Griffin and Sennesael were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Skyworks during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

224.   Defendants Griffin and Sennesael were provided with, or had unlimited access to, copies of the Company's public filings, earnings call scripts, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

225.   Each of Defendants Griffin and Sennesael spoke to investors on behalf of the Company during the Class Period, including at quarterly earnings calls and at industry and investor conferences. Therefore, each of Defendants Griffin and Sennesael was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Skyworks during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

226.   As set forth above, Skyworks violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

227.   By virtue of their positions as controlling persons of Skyworks and as a result of their own aforementioned conduct, Defendants Griffin and Sennesael are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Skyworks securities. As detailed above, during the respective times, Defendants Griffin and Sennesael served as officers and/or directors of Skyworks.

228.   As a direct and proximate result of the conduct of Defendants Griffin and Sennesael, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Skyworks common stock.

## XI.   CLASS ACTION ALLEGATIONS

229.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Skyworks common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

230.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Skyworks shares were actively traded on the NASDAQ Stock Market. As of May 7, 2025 there were approximately 153.6 million shares of Skyworks common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the Class. Class members who purchased Skyworks common stock may be identified from records maintained by Skyworks or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

231.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

232.    Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Lead Plaintiff has no interest that conflicts with the interests of the Class.

233.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a)    whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b)    whether the Defendants Griffin and Sennesael Defendants Griffin and Sennesael are personally liable for the alleged misrepresentations and omissions described herein;

(c)    whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(d)    whether the members of the Class have sustained damages, and the proper measure of damages.

234.    A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    PRAYER FOR RELIEF

235.    **WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

(a)   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representatives;

(b)   Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

(c)   Awarding Lead Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

(d)   Awarding such other and further relief as this Court may deem just and proper.

## XIII.  JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.


Dated: July 31, 2025                    Respectfully submitted,

                                        **BERNSTEIN LITOWITZ BERGER
                                          & GROSSMANN LLP**

                                        */s/ Jonathan D. Uslaner*
                                        Jonathan D. Uslaner (Bar No. 256898)
                                        jonathanu@blbglaw.com
                                        2121 Avenue of the Stars, Suite 2575
                                        Los Angeles, CA 90067
                                        Tel:   (310) 819-3481

                                        *-and-*

                                        John Rizio-Hamilton (admitted *pro hac vice*)
                                        (johnr@blbglaw.com)
                                        Robert Kravetz (admitted *pro hac vice*)
                                        (robert.kravetz@blbglaw.com)
                                        Abby Kritta (admitted *pro hac vice*)
                                        (abygail.kritta@blbglaw.com)

1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Lead Plaintiff Louisiana
Sheriffs' Pension & Relief Fund*

**KLAUSNER, KAUFMAN, JENSEN
   & LEVINSON**

Robert D. Klausner (*pro hac vice*
forthcoming)
7080 Northwest 4th Street
Plantation, FL 33317
Tel:    (954) 916-1202
Fax:    (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Louisiana Sheriffs'
Pension & Relief Fund*