1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3481

John Rizio-Hamilton (admitted *pro hac vice*)
johnr@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel:    (212) 554-1400

*Counsel for Lead Plaintiff*
*Louisiana Sheriffs' Pension & Relief Fund*
*and the proposed class*

[Additional counsel on signature block.]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SKYWORKS SOLUTIONS, INC. SECURITIES LITIGATION | Case No. 8:25-cv-00411-DOC-JDE <br><br> <u>CLASS ACTION</u> <br><br> **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Assigned to: Hon. David O. Carter <br><br> Date: January 12, 2026 <br> Time: 8:30 a.m. <br> Place: Courtroom 10A |

# **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................. 1

BACKGROUND ............................................................................. 3

I.      SKYWORKS'S VALUE DEPENDED ON ITS IPHONE CONTENT POSITION ..................................................................... 3

II.     DEFENDANTS MISREPRESENTED SKYWORKS'S IPHONE 16 CONTENT POSITION ............................................................ 6

III.    DEFENDANTS MISREPRESENTED SKYWORKS'S IPHONE 17 CONTENT POSITION ............................................................ 7

ARGUMENT .................................................................................. 8

I.      PLAINTIFF ADEQUATELY ALLEGES THE IPHONE 16 AND 17 DEVELOPMENT TIMELINE ..................................................... 8

        A.    The Former Employees Have Personal Knowledge of the Standard iPhone Development Timeline ................................ 9

        B.    Competitor Statements Further Corroborate the iPhone Timeline .................................................................... 10

        C.    Industry Insiders' Statements Corroborate the iPhone Timeline ........ 11

II.     THE COMPLAINT ALLEGES MATERIAL MISSTATEMENTS ............ 12

        A.    Alleged Misstatements Regarding the iPhone 16 ............................... 12

              1.    August 7, 2023 Quarterly Earnings Call .................................... 12

              2.    November 2, 2023 Quarterly Earnings Call ............................. 14

              3.    January 30, 2024 Quarterly Earnings Call ................................ 15

              4.    March 5, 2024 Investor Conference ......................................... 17

        B.    Alleged Misstatements Regarding the iPhone 17 ............................... 18

              1.    November 12, 2024 Earnings Call ............................................. 18

              2.    January 8, 2025 Investor Meetings ........................................... 19

        C.    Alleged Misstatements Regarding Hypothetical Risks ...................... 20

III.    THE COMPLAINT ALLEGES SCIENTER ................................................ 22

IV.     PLAINTIFF ADEQUATELY ALLEGES A SECTION 20(A) CLAIM ...... 25

CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES[1]

**Page(s)**

**CASES**

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ............................................................21, 24

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., Ltd.*,
   19 F.4th 145 (2d Cir. 2021) .............................................................8, 12

*Applestein v. Medivation*,
   861 F. Supp. 2d 1030 (N.D. Cal. 2012) ...............................................12

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ........................................................16, 17

*Baker v. Twitter, Inc.*,
   2023 WL 6932568 (C.D. Cal. Aug. 25, 2023) ......................................16

*In re Banc of California Sec. Litig.*,
   2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) ........................................23

*Berson v. Applied Signal, Inc.*,
   527 F.3d 982 (9th Cir. 2008) ...............................................9, 10, 24

*In re BioMarin Pharm. Inc. Sec. Litig.*,
   2022 WL 164299 (N.D. Cal. Jan. 6, 2022)............................................24

*In re Cloudera, Inc.*,
   121 F.4th 1180 (9th Cir. 2024) ............................................................21

*Cullen v. Ryvyl Inc.*,
   2024 WL 4536471 (S.D. Cal. Oct. 21, 2024) ................................9, 25

*Davis v. Yelp, Inc.*,
   2021 WL 4923359 (N.D. Cal. Sept. 17, 2021) ................................22

[1] Emphases are added and internal citations and quotations are omitted unless noted. Cites to "¶__" refers to paragraphs in the Consolidated Class Action Complaint (ECF No. 59). Cites to "DB" refer to the Defendants' Motion to Dismiss the Consolidated Class Action Complaint; Memorandum of Points and Authorities in Support Therein (ECF No. 60).

*E. Ohman J:Or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ...................................................................16

*Emps. Ret. Sys. of Gov't of V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ...................................................................10

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ...............................................................11

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) .............................................................20, 21

*Farhar v Ontrak, Inc.*,
    714 F. Supp. 3d 1198 (C.D. Cal. 2024) .................................................15

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) .................................................................13

*In re Fibrogen, Inc.*,
    2022 WL 2793032 (N.D. Cal. July 15, 2022) ...................................23, 25

*In re Fusion-io, Inc. Sec. Litig.*,
    2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ..........................................18

*Gammel v. Hewlett-Packard Co.*,
    2013 WL 1947525 (C.D. Cal. May 8, 2013) .............................................8

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .................................................................8

*Glazer Capital Mgmt., L.P. v. Forescout Techs.*,
    63 F.4th 747 (9th Cir. 2023) .................................................................15

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) .................................................................21

*Greco v. Qudian Inc.*,
    2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) ........................................10

*In re Hansen Nat'l Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) .................................................20

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015)....................................................12

*In re HI/FN, Inc. Sec. Litig.*,
  2000 WL 33775286 (N.D. Cal. Aug. 9, 2000) ...........................................16, 19

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .............................................................13, 17, 22

*In re Loewen Grp. Inc. Sec. Litig.*,
  2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) .......................................................11

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) .............................................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).............................................................................................13

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000)........................................................12, 22

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ............................................................................24

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ............................................................................24

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ..........................................................................19

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ............................................................................15

*Omnicare v. Laborers Dist. Council Const. Ind. Pens. Fund*,
  575 U.S. 175 (2015): (1)...................................................................................16

*In re OmniVision Techs., Inc. Sec. Litig.*,
  937 F. Supp. 2d 1090 (N.D. Cal. 2013)...........................................8, 10, 11, 20

*Peters v. Twist Bioscience Corp.*,
  2025 WL 2532671 (N.D. Cal. Sept. 3, 2025)....................................................14

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...................................................................*passim*

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ............................................................................23

*Roberts v. Zuora*,
  2020 WL 2042244 (N.D. Cal. April 28, 2020)....................................................10

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ............................................................................23

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ...........................................................................21

*Skiadas v. Acer Therapeutics, Inc.*,
  2020 WL 4208442 (S.D.N.Y. July 21, 2020)...............................................24, 25

*In re Splunk Inc. Sec. Litig.*,
  592 F. Supp. 3d 919 (N.D. Cal. Mar. 21, 2022) .................................................9

*In re SVB Fin. Grp. Sec. Litig.*,
  2025 WL 1676800 (N.D. Cal. June 13, 2025)....................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).........................................................................................22

*Terezeni v. GoodRx Holdings, Inc.*,
  2022 WL 122944 (C.D. Cal. Jan. 6, 2022) ........................................................13

*Turocy v. El Pollo Loco Holdings, Inc.*,
  2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) .....................................................12

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) ..............................................................................14

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..............................................................................8

**STATUTES**

15 U.S.C. §78t-1 ...................................................................................................25

15 U.S.C. §78u-4..............................................................................................11, 12

Louisiana Sheriffs' Pension & Relief Fund, Lead Plaintiff ("Plaintiff"), respectfully opposes Defendants' Motion to Dismiss (ECF No. 60).

## INTRODUCTION

Skyworks is a semi-conductor company that generates the majority of its revenue by supplying components to Apple for iPhones. The Complaint alleges that Defendants—Skyworks and its former CEO, Liam K. Griffin, and its former CFO, Kris Sennesael—repeatedly misled investors that Skyworks was maintaining or growing its content position in the iPhone 16 and iPhone 17. For example, Defendants told investors, "[W]e continue to win big" with Apple, that "nothing is really concerning" regarding the Apple relationship, and that the "back and forth [with Apple] is always going our way."

These statements were false and misleading. Under the established timeline in which Apple communicated content decisions to iPhone suppliers, Defendants knew that Skyworks had lost a material content position in each of the iPhone 16 and the iPhone 17 when they made these misstatements. When Defendants finally revealed the iPhone 16 content losses in April 2024, the market was stunned, leading to a share price decrease of 15%. To comfort investors, Defendants portrayed those losses as a one-time aberration. Yet, just ten months later, in February 2025, Defendants were forced to disclose *even greater* content losses in the iPhone 17, causing the share price to plummet by 25%. Griffin, a long-time Skyworks executive, was forced to resign; Sennesael followed him at the end of the next quarter.

Defendants' Motion distorts the well-pleaded facts and misapplies the law in arguing that the Complaint fails to allege falsity and scienter. Their arguments fail.

Defendants' principal argument is that the Complaint fails to adequately allege the well-established timeline in which Apple communicated content decisions to Skyworks. The timeline allegations are supported by detailed and corroborative sources, including well-placed former employees who worked at Skyworks over

multiple iPhone cycles, competitors who revealed information about iPhone content wins, well-sourced analysts and other industry insiders, and credible media sources. These facts are more than sufficient to allege the product development timeline at the pleading stage. Indeed, Defendants do not advance *any* argument that there had been a change in the standard timeline for the iPhone 16 and iPhone 17.

Defendants next contend that the Complaint fails to allege a single actionable misstatement, asserting that their statements were forward-looking, mere puffery, or opinions. Because each of these statements misrepresented present facts, and were not accompanied by any meaningful cautionary language, they do not qualify for the safe harbor. Likewise, none of the misstatements are immaterial puffery. Each related to Skyworks's relationship with its self-described "largest customer" and "most important customer," Apple, and the misstatements directly influenced analysts' coverage. Further, because Defendants misrepresented facts, not opinions, their misstatements easily satisfy the *Omnicare* standard even if analyzed as opinions. Finally, Defendants did not accurately disclose the risk of content losses to investors in SEC filings; rather, they misleadingly described content losses as hypothetical and provided later, unqualified assurances that Skyworks's content position was secure.

Finally, the Complaint adequately alleges scienter. Defendants' claim—that Plaintiff must allege direct, "smoking-gun" evidence of when Apple informed Defendants of content losses—misstates the scienter pleading standard. Direct admissible evidence of knowledge is not required; instead, *Tellabs* allows Plaintiff to plead facts that, holistically, support a strong inference of scienter. Here, the strongest and most reasonable inference is that Defendants knew about the content losses given the established iPhone content timeline, Defendants' repeated statements evincing their knowledge of Skyworks's content position with Apple, and the undisputable fact that selling iPhone components to Apple was the critical core operation at Skyworks. Even if Defendants did not know this information (which is

implausible), their positive statements to investors about Skyworks's so-called positive execution and content gains were highly reckless.

Defendants' motion should be denied in its entirety.

## BACKGROUND

## I. SKYWORKS'S VALUE DEPENDED ON ITS IPHONE CONTENT POSITION

Skyworks is a semiconductor manufacturer that provides radio frequency front-end modules for iPhones. ¶2. Apple accounted for 69% of Skyworks's overall revenue in 2024 and, at times in the Class Period, *over 70%* of its revenue; approximately 85% of the Apple revenue related to the iPhone. ¶¶1, 3, 35. As a result, Defendants referred to Apple as Skyworks's "largest" and "most important" customer. ¶¶4, 35, 191. Analysts recognized Skyworks's outsized dependence on Apple for its revenues, and that "it would be a catastrophic blow to Skyworks if it were to ever miss out on a future iPhone design cycle." ¶37.

Since 2007, Apple has released a new iPhone model each year – now always in September. ¶45. Given the iPhone's technological complexity, Apple has relied on a standard, multi-year development timeline for each model launch:

- Approximately 17-18 months before the iPhone launch date, i.e., March or April in the prior year, component suppliers, like Skyworks submitted their bids, and Apple engaged in a process to pick content suppliers. ¶50.[2]

- Approximately 15-16 months before the iPhone launch date, i.e., May or June of the prior year, Apple made content selections and notified suppliers. ¶¶51-53.

- Approximately 12 or 13 months before the iPhone launch date, i.e., August or September of the prior year, the selected component suppliers began their initial production process. ¶54.

- Approximately eight months before the iPhone launch date, i.e., January in the year of the launch, Skyworks and other component suppliers began

---

[2] For approximately two years prior to bidding, Skyworks would make multiple versions of the components it would submit to Apple for consideration. ¶49.

sending manufactured components to Apple so that Apple can begin its own production process. ¶54.

The Complaint corroborates this timeline through multiple sources.

**First**, two Skyworks former employees involved in the manufacturing process confirmed the timeline. FE 1 worked at Skyworks from April 2015 to March 2023 as a Program Management Support-Pre-Production Expeditor in Newbury Park, California, and specialized in inventory, supply planning, and program management for Apple products. ¶38. In that role, FE 1 participated in weekly, monthly, and quarterly production meetings in which Defendant Griffin and other Skyworks executives discussed Skyworks's main customers and competitors, as well as the specific components on which Skyworks had won or lost in the bidding process. ¶¶182-83. Given FE 1's job responsibilities, FE 1 was in a position to know that Skyworks learned about bidding decisions for an upcoming iPhone model by June of the preceding year (i.e., approximately 15 months prior to launch). ¶53 (noting FE 1's participation in site-level program management teams in which "FE 1 and the program management team would know what products Skyworks won in the bidding process, as well as whether components would be dual-sourced"). FE 1 further described that production commenced in or around August or September of the preceding year (i.e., approximately 12-13 months prior to launch), with larger builds handled by Skyworks's Mexicali, Mexico facility. ¶54. According to FE 1, Skyworks would send certain manufactured component parts to Apple in or around January of the launch year (i.e., 9 months prior to launch). *Id.*

FE 2 is another former Skyworks employee who worked as a Senior Supply Chain Manager at Skyworks's facilities in Mexicali, Mexico, from 2017 to 2023. ¶59. In that role, FE 2 was responsible for the planning and procurement of manufacturing at the Mexicali facility, as well as for managing outsource services (planning, procurement, and deliveries) in the Asia Pacific Region. *Id.* FE 2 confirmed that iPhone manufacturing began in Mexicali in approximately early-

January of the year of release, following earlier production in the United States. *Id.*

**Second**, Skyworks's competitors and analysts from leading financial firms also corroborated key aspects of the timeline. For example, both Goldman Sachs and Oppenheimer reported in June 2024 that Broadcom, which had existing content positions within the iPhone but not the specific RF components manufactured by Skyworks, disclosed that it had won "new RF content in iPhone 17 **next year**"—i.e., for the September 2025 iPhone 17 launch date. ¶¶91-92. After Skyworks revealed that it lost content in the iPhone 17 in February 2025, other analysts connected that content loss by Skyworks to Broadcom's June 2024 disclosure. ¶113 (Wolfe Research note referencing Broadcom's summer disclosure of "content gains in an area they had not previously participated"); ¶115 (J.P. Morgan note regarding Broadcom's "prior comments on potential share gains"). Thus, Broadcom and at least four prominent analysts reported that Broadcom had won RF content in June 2024, approximately 15 months before the iPhone 17 launch—which is consistent with the established iPhone timeline alleged in the Complaint.

Likewise, Qualcomm, another one of Skyworks's main competitors, told analysts in November 2023 that it "expect[ed] this 10-ish percentage increase in content at the minimum" for the upcoming iPhone 16, which was not scheduled to launch until September 2024, nearly ten months later. ¶68. As analysts subsequently determined, this increase resulted, in part, from Qualcomm winning a component on the iPhone 16 at Skyworks's expense. ¶¶81-85.

**Third**, multiple media and industry publications further corroborated the timeline. For example, in a 2020 interview with the *Wall Street Journal*, a senior Apple executive explained that Apple follows a multi-year process to develop the iPhone in part to "plan how multiple chips work together to limit power consumption and free up space inside iPhones[.]" ¶48. In January 2023, *PC Magazine* reported that Apple had begun its early production process, known as New Product Introduction, for the iPhone 15; this meant that Apple had "an actual production line

running for the new [iPhone model]" eight months before launch. ¶58. And in a May 2025 interview, a former Apple manager who had just left the company told the industry publication *AlphaSense Expert Insights* that content suppliers like Skyworks begin producing their components approximately a year before the iPhone launch date in September, at which point Apple has "already locked the design down." ¶55 (noting Apple pulled stock together "a year out from launch").

## II.    DEFENDANTS MISREPRESENTED SKYWORKS'S IPHONE 16 CONTENT POSITION

By June 2023, Defendants knew that Skyworks lost content on the iPhone 16 because Apple awarded a component to Qualcomm instead, decreasing Skyworks's position by approximately 10%. ¶¶76-83. Yet, as illustrated by the timeline in Appendix A (Figure 1), Defendants repeatedly misled investors that Skyworks had maintained or grown its iPhone 16 content between August 2023 and April 2024.

On August 7, 2023, for example, Sennesael stated that "*we continue to win big with [Apple]*" and that "*we win with . . . every product . . . that they will bring to the future.*" ¶128. On November 2, 2023, Griffin answered a question about Skyworks's ability to "grow content another 10%" in 2024 by saying that the Company was "executing in an outstanding way" and "certainly matching the challenges with our top tier customers." ¶132. On January 30, 2024, Griffin answered a direct question about "losing content at [Apple] in the second half of the year" by claiming that "*[n]othing is really concerning on that point[.]*" ¶¶134-136.

These statements led analysts to believe that Skyworks's iPhone position "is secure gen/gen" and that it "can sustain 10% Y/Y dollar content growth in future smartphone launches." *E.g.*, ¶75 (analyst reports in Aug. 2023, Nov. 2023, and Jan. 2024). When Defendants finally disclosed the content loss in April 2024, Skyworks's share price fell approximately 15%. ¶¶76-80. Analysts directly attributed the decline to Skyworks's disclosure about its lost content position to Qualcomm. ¶¶81-84.

## III.    DEFENDANTS MISREPRESENTED SKYWORKS'S IPHONE 17 CONTENT POSITION

After the iPhone 16 content loss, investors focused on whether this was a "transitory issue" for Skyworks. ¶87. Analysts were comforted by Skyworks's claim that this loss was limited to "one year, one socket." ¶¶86-87. Unbeknownst to investors, the iPhone 16 loss was far from transitory. By June 2024 when Broadcom disclosed a "new RF content [win] in iPhone 17," ¶92, Defendants knew that Skyworks had lost an additional content position on the iPhone 17.

Yet, as illustrated by Figure 2 in Appendix A, Defendants repeatedly misled investors that Skyworks's content position on the iPhone 17 was secure. On an earnings call on November 12, 2024, for example, Griffin answered a direct question about Skyworks's ability to win back content by claiming that the "***back and forth [with Apple] is always going our way***." ¶140. In a meeting with Oppenheimer analysts on January 8, 2025, Sennesael said the iPhone 16 loss was an "aberration," that Skyworks had "positive tailwinds from Apple design process," and that the Company expected "content ASP [Average Selling Price] back to historical average 10%/year growth." ¶¶142-43. Analysts credited these reassurances. ¶¶86-87.

On February 5, 2025, when Skyworks had no choice but to reveal its iPhone 17 position and Griffin's immediate resignation, it disclosed that it had lost an additional 20-25% of content in the iPhone 17—as a socket previously sold by Skyworks would now be dual-sourced. ¶¶104-08. The share price plummeted by 25%. ¶110. This disclosure shocked analysts, who connected Skyworks's loss of Apple content with both the stock price decline and Griffin's resignation. ¶¶111-22. Skyworks's new CEO admitted in March 2025 that, ***over the last three years***, the Company had not "been growing our content," that "we haven't been performing that well," and that the Company had not delivered "the best product." ¶¶123-27. Sennesael departed the next quarter. ¶31.

# **ARGUMENT**

## **I. PLAINTIFF ADEQUATELY ALLEGES THE IPHONE 16 AND 17 DEVELOPMENT TIMELINE**

On motions to dismiss, courts must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). To properly allege falsity, Plaintiff need only "specify each statement alleged to have been misleading, the [] reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009). At this stage, a court is "not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (reversing dismissal).

Consistent with these principles, courts routinely credit product development and supply chain timelines based on the descriptions of former employees and industry norms. *See, e.g.*, *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *13 (C.D. Cal. May 8, 2013) (crediting former employee allegations); *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1106-07 (N.D. Cal. 2013) (relying on a former employee, analyst reports, and a competitor); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., Ltd.*, 19 F.4th 145, 150-51 (2d Cir. 2021) (crediting allegations from former employees and news articles).

Defendants contend that the Complaint fails to properly substantiate the timeline of when Apple informed them that Skyworks had lost content in the iPhones 16 and 17. DB 6. But, as described below, the Complaint establishes the standard development timeline that Apple has followed to launch its new iPhone models, including iPhones 16 and 17, based on first-person accounts of former employees, statements of Skyworks's competitors, and credible media and industry sources.

### A.   The Former Employees Have Personal Knowledge of the Standard iPhone Development Timeline

The Complaint describes the personal involvement of FE 1 and FE 2 in Skyworks's process of manufacturing iPhone content "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" about the standardized iPhone timeline. *Quality Sys.*, 865 F.3d at 1145. The Complaint "includes each confidential witness's job description and responsibilities," as well as their "exact title," *id.*, and it recounts how each worked at Skyworks over a multi-year period and had personal knowledge of the Skyworks manufacturing process for the iPhone. FE1's and FE 2's statements also corroborate each other, which further "supports the reliability of the statements." *Cullen v. Ryvyl Inc.*, 2024 WL 4536471, at *13 (S.D. Cal. Oct. 21, 2024) (citing cases). Other evidence corroborates the timeline allegations, *infra* at 9-12, which bolsters the reliability inference. The FE allegations are thus more than sufficient to establish the reliability and personal knowledge required under the law. *See, e.g.*, *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919 (N.D. Cal. Mar. 21, 2022).

Defendants' attempts to discredit the FE allegations should be rejected.

*First*, Defendants suggest that because neither FE had "responsibility for any aspect of the" down selection process, neither would have known about bidding and selection decisions. DB 7. Yet, the Ninth Circuit has rejected that executive decision-making is a requirement to be a reliable witness. *Berson v. Applied Signal*, *Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Defendants do not contest that FE 1 and FE 2 were involved in the manufacturing process, and they ignore specific allegations that Griffin and other Skyworks executives informed employees like FE 1 about the status of bidding and sourcing decisions. ¶¶182-83. That neither FE 1 nor FE 2 interfaced with Apple about sourcing decisions is immaterial. Each worked at Skyworks for multiple years (FE 1 for over eight years and FE 2 for over five years) and were "in a position to know" Skyworks's iPhone manufacturing timeline.

*Berson*, 527 F.3d at 985.

*Second*, Defendants claim that the Court should discredit the FE allegations because FE 1 and FE2 left Skyworks before the launch of the iPhone 16 and iPhone 17. However, courts regularly credit statements of former employees who were not employed during the class period. *Quality Sys.*, 865 F.3d at 1145; *Roberts v. Zuora*, 2020 WL 2042244, at *11 (N.D. Cal. April 28, 2020). FE 1 and FE 2, who were each personally involved with Skyworks's production of iPhone components over multiple development cycles, knew, or at least "could reasonably deduce," the iPhone development timeline. *Berson,* 527 F.3d at 985. These are the exact type of "allegations concerning activity in one period" that "can support an inference of similar circumstances in a subsequent period." *Emps. Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). Notably, Defendants do not advance *any* argument that there had been a change in the standard timeline for the iPhone 16 and iPhone 17. *OmniVision,* 937 F. Supp. 2d at 1113 ("the court can reasonably infer" that a long-term practice remained "unchanged" two years later); *Greco v. Qudian Inc.*, 2022 WL 4226022, at *13 (S.D.N.Y. Sept. 13, 2022) (inference that practice described by CW continued into the Class Period.).

## B. Competitor Statements Further Corroborate the iPhone Timeline

The iPhone development timeline is corroborated by information relating to two of Skyworks's competitors—Qualcomm and Broadcom. *Supra* at 5. For example, Broadcom and several analysts disclosed that Broadcom had won new content in the iPhone 17 in June 2024, approximately 15 months prior to the iPhone 17 launch. ¶¶90-93. Multiple analysts later connected that win to Skyworks's lost content. ¶¶113-16. Likewise, Qualcomm told investors in November 2023 that it had won new content in the iPhone 16, ¶68, which analysts connected to Skyworks. ¶¶81-84. As in *Omnivision*, this information corroborates that Apple notified component suppliers like Skyworks, Qualcomm, and Broadcom of their iPhone 16 and iPhone 17 content positions well before Skyworks revealed the truths in April

2024 and February 2025. *See* 937 F. Supp. 2d at 1109 (crediting allegations that "Apple was seriously considering purchasing some or all of the camera components at issue from Sony" based on statements by Sony and within analyst reports).

Rather than address the clear import of the Qualcomm and Broadcom statements, Defendants wrongly contend that "Plaintiff concludes, ***with no other facts***, that Skyworks must have known of a content loss at [the] time" of the Broadcom statement. DB 11. This is belied by the extensive former employee and industry insider information detailed in the Complaint and discussed above. More basically, Defendants improperly ask the Court to construe each factual allegation in isolation while ignoring the other facts alleged by Plaintiff, and to withhold any favorable inferences from Plaintiff. This argument directly contradicts that courts "take all allegations of material fact as true," *Quality Sys.*, 865 F.3d at 1140, and holistically assess the Plaintiff's "narrative of fraud." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). Viewed collectively, the Qualcomm and Broadcom allegations further support an inference that Skyworks, like its competitors, knew of its content losses before the misstatements. Defendants' argument that Apple informed Qualcomm and Broadcom of content wins months before informing Skyworks of content losses is implausible.

### C.    Industry Insiders' Statements Corroborate the iPhone Timeline

"Media sources can satisfy the heightened pleading standard" of the PSLRA. *In re Loewen Grp. Inc. Sec. Litig.*, 2004 WL 1853137, at *6 (E.D. Pa. Aug. 18, 2004) (considering information "published in industry journals . . . and reputable newspapers" as "being independent and reliable"). Here, interviews with Apple executives in *AlphaSense* and the *Wall Street Journal* and reporting by *PC Magazine* further corroborate FE 1 and FE 2's iPhone development timeline.

As recently as May 2025, an executive who worked at Apple until earlier that month, confirmed to *AlphaSense* that "a year out from launch," Apple would be "getting the [component] manufacturers making their bits [and] trying to get some

stock together." ¶55. This supports *PC Magazine*'s report that, by January 2023, Apple's own production for iPhone 15 had begun. ¶58. As courts recognize, media sources can support plausible allegations as to a "typical . . . production supply chain timeline." *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159-60 (N.D. Cal. 2015); *Qihoo*, 19 F.4th at 150-51 (crediting two news articles).

Defendants' reliance on *Applestein v. Medivation*, 861 F. Supp. 2d 1030, 1038-39 (N.D. Cal. 2012), DB 7, is unavailing. *AlphaSense* is an industry publication containing transcribed interviews with industry insiders. The published *AlphaSense* interview is not "hearsay" that counsel learned about by eavesdropping on a conversation; nor was the former Apple executive interviewed as a "confidential witness." *Id*. The suggestion that Plaintiff cannot rely on publicly available information in an industry resource like *AlphaSense* at the pleadings stage, DB 7-8, simply misstates the law. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1271 (N.D. Cal. 2000) (crediting news articles because PSLRA does not require plaintiffs "to produce admissible evidence" at the pleadings stage).

## II.  THE COMPLAINT ALLEGES MATERIAL MISSTATEMENTS

Based on the timeline in which Apple communicated content decisions, the Complaint pleads Defendants made a series of misleading statements to investors that "affirmatively created an impression" that Skyworks had secured or grown its content position for the iPhone 16 and the iPhone 17, when the truth was the opposite of that "affirmative[] impression": Defendants knew that Skyworks had lost material content positions in both iPhone cycles. *Turocy v. El Pollo Loco Holdings, Inc*., 2017 WL 3328543, at *9-10 (C.D. Cal. Aug. 4, 2017).

### A.  Alleged Misstatements Regarding the iPhone 16

#### 1.  August 7, 2023 Quarterly Earnings Call

Defendants selectively quote Sennesael's answer to a question in this earnings call to suggest it relates to "revenue generated by content wins from the iPhone 15 and other Apple products" and was thus not misleading. DB 13. But Sennesael said

that Skyworks "**continue[s] to win big**" with Apple, and also that Skyworks wins on "every product that they brought to the market and **that they will bring to the future**." ¶65. Once Sennesael chose to speak on current and future Apple revenue, he was "bound to do so in a manner that wouldn't mislead investors." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018). The statement referencing "continu[i]ng" (as well as "future") content wins misrepresented Skyworks's content position for the iPhone 16 cycle that was then under development, and it was false because Sennesael knew before August 2023 that Skyworks had **lost** content in this cycle. Whether investors *only* would have interpreted the statement as relating to the iPhone 15 cannot be decided on the pleadings, particularly given allegations that analysts believed Skyworks's iPhone position was "secure gen/gen." ¶75. "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir. 1995).

Defendants are also wrong to suggest this statement is inactionable puffery.[3] Sennesael responded to an analyst's specific question about Skyworks's revenue from its largest customer, Apple, in which he addressed a "specific aspect[] of the company's operations," its crucial relationship with Apple for iPhone content. *Quality Sys.*, 865 F.3d at 1143-44 (statement reassuring investors "that the number and type of *prospective* sales in the pipeline was unchanged, or even growing" actionable) (citing cases). The fact this answer led analysts to view Skyworks's iPhone position as "secure" further refutes the puffery argument. *E.g.*, ¶75. In contrast, the puffery cases cited by Defendants, DB 13, involved generic corporate statements that were "otherwise true," *Terezeni v. GoodRx Holdings, Inc.*, 2022 WL

---

[3] Puffery determinations are "inherently fact-specific" inquires that are generally inappropriate at the pleading stage. *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 39 (2011); *In re SVB Fin. Grp. Sec. Litig.,* 2025 WL 1676800, at *11 (N.D. Cal. June 13, 2025) ("courts must exercise great caution" regarding puffery).

122944, at *4 (C.D. Cal. Jan. 6, 2022); or "nebulous" statements regarding "quality" that were not objectively verifiable (like whether Skyworks had gained a content position in the next iPhone). *Peters v. Twist Bioscience Corp*., 2025 WL 2532671, at *7 (N.D. Cal. Sept. 3, 2025).

## 2.    November 2, 2023 Quarterly Earnings Call

Defendants next attack two statements made by Defendant Griffin during an earnings call on November 2, 2023, contending that they are unrelated to Apple or mobile content, and constitute immaterial puffery. Both arguments fail.

First, Griffin was asked whether Skyworks "can grow content another 10%" in 2024. ¶132. A reasonable investor would have interpreted the question to be about 2024 revenues relating to the iPhone 16, as the Complaint details numerous instances in which investors understood Defendants' references to 10% growth year-over-year as relating to the iPhone. *See* ¶¶8, 13, 66, 69, 75, 99-101, 132.

Griffin answered by saying that his team was "***executing*** in an outstanding way," committed to "growth," and "certainly ***matching the challenges*** with our ***top tier customers***." ¶132. Contrary to Defendants' claim that "no alleged facts show that the market" connected this statement to "a particular content position in the iPhone 16," DB 14, the Complaint cites multiple analysts who interpreted the response in this exact manner. ¶75 (November 3, 2023 UBS research note stating "***SWKS remains a trusted supplier to AAPL and we think SWKS can sustain ~10% Y/Y dollar content growth in future smartphone launche***s"); *id.* (Oppenheimer note stating that Skyworks's iPhone position "***is secure gen/gen***, in our view"). It was not puffery because the exchange related to a specific and material metric—growing revenue by 10% for the next iPhone cycle. *Supra* at 13-14; *see also Warshaw v. Xoma Corp*., 74 F.3d 955, 959 (9th Cir. 1996) (even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim" when they address specific aspects of a company's operation that the speaker knows to be performing poorly).

Likewise, the additional statement, "In the mobile business we absolutely know where the dollars are and where the opportunities are, and we have eyes on all that, and we'll continue to drive that portfolio very strong," was misleading. ¶131. While the initial question related to inventory adjustment and "shipping to actual real consumption," (*id.*), Griffin's unhedged response suggested that Skyworks would "sustain" "content growth in future smartphone launches" such as the iPhone 16, (¶75). Because Skyworks's content position was "capable of objective verification," *cf. Farhar v Ontrak, Inc.*, 714 F. Supp. 3d 1198, 1209 (C.D. Cal. 2024) (DB 14), the statement is not immaterial puffery.

### 3.  January 30, 2024 Quarterly Earnings Call

On a quarterly earnings call on January 30, 2024, Defendant Griffin made two misleading statements after Skyworks not only knew its reduced iPhone 16 content position, but also had begun manufacturing its assigned component parts. First, in answer to an analyst question about whether ***Skyworks "may be losing content at your largest customer in the second half of the year"***—i.e., in connection with the iPhone 16—and "***how you're feeling content-wise with that largest customer***," Griffin stated that "we ***have*** a great position with our largest customer," "[n]othing really ***is*** concerning on that point," "we ***know*** exactly who we are and who they are," "we ***have*** great partnerships," and "***we'll continue*** to drive success." ¶136.

This was not a forward-looking response, DB 14, but rather an answer using the present tense asserting present facts in response to a question about the present (i.e., whether Skyworks "may be losing content"). The safe harbor does not insulate misleading statements about current or past facts. *Glazer Capital Mgmt., L.P. v. Forescout Techs.*, 63 F.4th 747, 774 (9th Cir. 2023) (statement that company's "pipeline was large, healthy, and continuing to grow" was not forward-looking since it "describe[d] . . . current conditions"); *Quality Sys.*, 865 F.3d at 1142-43 (statements about sales pipeline, such as "[o]ur pipeline is deep[,]" are not forward looking); *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th

195, 210-11 (5th Cir. 2023) (assertion that parks "were undergoing sufficient construction to meet the deadlines" misled investors about the Company's present construction).

Further, Defendants identify no meaningful cautionary language that would allow them to qualify for the safe harbor. *Baker v. Twitter, Inc.*, 2023 WL 6932568, at *7 (C.D. Cal. Aug. 25, 2023) (defendants "bear the burden of showing" the presence of "cautionary language [that] was not boilerplate"). The alleged cautionary language "must relate directly to that which plaintiffs claim to have been misled," *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017); and it also must not be "spread out among various documents." *In re HI/FN, Inc. Sec. Litig.*, 2000 WL 33775286, at *5 (N.D. Cal. Aug. 9, 2000). Here, Defendants fail to identify any specific cautionary language, let alone such language that directly accompanied the misstatements. Insofar as Defendants wish to rely on the risk disclosures in Skyworks's 10-K filings, those disclosures are themselves deficient and misleading. *Infra* at 20-21. In addition, any cautionary effects of the risk disclosures in Defendants' earlier SEC filings were negated when Griffin gave investors unqualified positive reassurances in the January 2024 earnings call.

Nor is the statement an inactionable opinion. Whether Skyworks was " losing content" as of January 30, 2024, is a verifiable fact, not an opinion, and Griffin's statements about Skyworks's content position in the iPhone 16 "directly contradict[ed] what [he] knew at the time." *E. Ohman J:Or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 929 (9th Cir. 2023). Even if construed as an opinion, the Complaint plausibly alleges falsity under each prong of *Omnicare v. Laborers Dist. Council Const. Ind. Pens. Fund*, 575 U.S. 175 (2015): (1) Griffin did not subjectively believe that "nothing really is concerning" given the material content loss; (2) the answer includes the false embedded fact that "nothing" was concerning about the loss of content; and (3) Griffin omitted facts about Skyworks's material loss of content position "whose omission makes the opinion statement at issue"—which

was specifically about whether Skyworks may be losing Apple content—misleading to a reasonable person. *See Atossa Genetics*, 868 F.3d at 801-802.

Griffin also misled investors by telling them that Skyworks "remain[s] bullish on the long-term RF content story in smartphones coupled with growing 5G penetration." ¶135. Defendants' claim that a statement about long-term RF content in "smartphones" does not relate to Apple or the iPhone is meritless. Apple was Skyworks's largest customer, and sales to Apple represented the bulk of Skyworks's revenues. ¶¶1, 4, 27, 35, 118, 120, 135-36, 140, 169-70, 179, 191. Indeed, the defense exhibit cited by Defendants notes that sales to Apple comprised 73% of total quarterly revenue. D.Ex.4 at 9. Nor was the statement immaterial puffery. Whether Skyworks could grow "long-term RF content" was a primary metric that analysts focused on in assessing the Company. ¶¶64, 66, 69, 72, 90, 98-100, 118-19, 145. When Skyworks finally reported that it had lost a material content position on the iPhone 16, the share price cratered, ¶¶76-80, further demonstrating materiality.

### 4.    March 5, 2024 Investor Conference

On March 5, 2024, Defendant Griffin participated in the Morgan Stanley Technology, Media & Telecom Conference. ¶72. The host asked him a question that directly referenced the iPhone 16 and other models. In response, Griffin explained, "***I don't want to be too controversial about it, but the larger customer definitely prefers the kind of things that we do, honestly. No one really likes to deal with contracts and agreements and this and that***." ¶¶73, 138. Griffin stated further that there is "***nothing that we really can't handle***." *Id.*

This statement was misleading. Having decided to speak about Skyworks's largest customer, Apple, Griffin was required to provide complete and accurate information so as not to materially mislead investors. *Khoja*, 899 F.3d at 1009. Claiming that the "larger customer definitely prefers the kinds of things that we do" and that there was "nothing" in the relationship "that we really can't handle" was misleading because Griffin did not inform investors that Skyworks had lost a content

position on the iPhone 16. ¶¶138-39. Such an omission is actionable if viewed either as creating a misleading half-truth, or as an omission rendering an opinion about the Apple/Skyworks relationship materially incomplete. *Supra* at 17.

Nor was the statement immaterial puffery. The status of Skyworks's relationship with Apple was clearly important to the host, who asked about it at a public investor conference. Griffin's response was not a "feel good moniker," *cf. In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *14 (N.D. Cal. Feb. 12, 2015), but a representation that Apple preferred Skyworks's product—made just prior to Skyworks's revelation that it suffered a material content loss that led to a severe drop in the stock price, shocking analysts. ¶¶76-85.

### B.    Alleged Mistatements Regarding the iPhone 17

#### 1.    November 12, 2024 Earnings Call

Defendants' assertion that Griffin's statement on November 12, 2024 was not specific to the iPhone 17 is belied by the earnings call transcript they attach as an exhibit to their brief. As that transcript reveals, an analyst asked "what's going on with your largest customers," referenced what "appears to be temporary upheaval," and specifically asked, "What's your feeling in terms of 2025" as "there's some content changes in the last flagship phone" (i.e., the iPhone 16, which had just been released in September). D.Ex.6 at 5. He further asked Griffin about his view regarding Skyworks's "ability to gain back content when they"—i.e., Apple—"make a big shift and then perhaps grow from there." *Id.*

Griffin's answer—that "we have a very good partnership with our largest customers," that the "back and forth is always going our way," and that "we have the confidence of our most important customer"—reiterated Skyworks's narrative to investors that its iPhone 16 content loss was a "one year, one socket" event and that its relationship with Apple (Skyworks's "largest" and "most important" customer, ¶¶4, 7, 35, 169, 187) was secure. ¶¶86-87. This was misleading because Griffin knew that Skyworks had lost a material content position on the upcoming iPhone 17. ¶¶96-

97, 140. Indeed, analysts had already reported *five months earlier* that Broadcom won a new iPhone 17 content position, which supports an inference of falsity.

Defendants' only substantive challenge is that the statement was "forward-looking." Once again, Griffin discussed the present status of Skyworks's relationship with Apple and its present ability to gain back content—to which Griffin provided a present-tense response touting that relationship, without describing his awareness of iPhone 17 content losses. *Supra* at 16. Nor do Defendants provide any meaningful cautionary language accompanying Griffin's statement that is not "spread out among various documents." *HI/FN, Inc.*, 2000 WL 33775286, at *5. The only document Defendants cite (DB 15) is the November 2023 10-K, which misleadingly described content losses as hypothetical. *Infra* at 20-21. And Griffin further swept away this risk by asserting that the "back and forth is always going our way." ¶87.

### 2.    January 8, 2025 Investor Meetings

The Complaint alleges that three statements made to analysts during a "sit-down" at an investor conference, and reported by Oppenheimer and JP Morgan, respectively, are materially misleading. Defendants' principal argument is that statements recounting what a Defendant told analysts are inactionable as a matter of law. DB 16-17. That ignores that misstatements that "clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression" as reported in analysts' reports, can "be actionable even if they are not exact quotations." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234-35 (9th Cir. 2004) (finding actionable statement "Oracle sees robust demand for both its database and applications business," as reported by analyst).

Here, the Oppenheimer report describes a "sit down" with Sennesael, who was accompanied only by an investor relations executive. It then directly cites several statements about Skyworks's operations from Sennesael–identified as "mgmt.," e.g., "Mgmt sees iP 15/16 [iPhone 15 and iPhone 16] as aberration years," management "highlighted positive tailwinds from Apple design process," and

"Mgmt sees content [Average Selling Price] back to historical average 10%/year growth."[4] ¶¶98-99. When an analyst report specifically attributes statements to "Management," "it is certainly plausible that the statements originated from" the sole company executive who met with the analysts. *OmniVision*, 937 F. Supp. 2d at 1105-06; *Nursing Home*, 380 F.3d at 1234. Further, the JP Morgan analyst report dated January 8, 2025, which contains very similar summaries of company statements from a meeting with Sennesael the same day, also satisfies this standard.

Finally, Defendants' reliance on cases involving an "imprimatur" theory of falsity (i.e., where plaintiffs seek to hold companies liable for adopting outside analysts' forecasts), or where analysts repackage a statement in vague terms, DB 17, is misplaced. This case, by contrast, involves only statements about specific growth metrics that "clearly originated from the defendants," i.e., "management," and are actionable. *Nursing Home*, 380 F.3d at 1234-35 (distinguishing between misstatements attributed to company executives and of forecasts by third parties on which executives "put their imprimatur").

## C.    Alleged Misstatements Regarding Hypothetical Risks

Skyworks filed its Form 10-K annual reports in November 2023 and 2024, at a time when Defendants knew of lost content positions in the iPhone 16 and iPhone 17, respectively. ¶¶147-50. These risk statements were incorporated into subsequent quarterly disclosures during the Class Period. ¶151. The risk disclosures were misleading because they presented the risk of losing content with Apple as hypothetical when Defendants knew that Skyworks had already lost content positions in the upcoming iPhone 16 and 17 models. ¶¶147-52. Such "inadequate" risk statements are actionable because they misrepresent specific types of risks "as purely hypothetical when that exact risk had already transpired." *In re Facebook,*

---

[4] Defendants are wrong that Plaintiff relies on "group pleading" or a presumption that the alleged misstatements "are the collective action of the Defendants." *Cf. In re Hansen Nat'l Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153-54 (C.D. Cal. 2007).

*Inc. Sec. Litig.*, 87 F.4th 934, 949, 951 (9th Cir. 2023); *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (risk disclosures actionable when the supposed possible risks had "come to fruition").

Defendants' reliance on *In re GlenFed, Inc. Securities Litigation* and *In re Cloudera, Inc.*, DB 17-18, is unavailing; neither decision analyzed the falsity of risk disclosures, unlike the controlling *Facebook* and *Matrixx* decisions. In *GlenFed*, moreover, the Ninth Circuit *rejected* the "fraud by hindsight" argument because, as here, the *GlenFed* plaintiff identified "contemporaneous . . . information" at odds with the alleged misstatements. 42 F.3d 1541, 1549 & n.8 (9th Cir. 1994). *Cloudera* also is distinguishable because, unlike here, the complaint failed to allege why the misstatements were false when made. 121 F.4th 1180, 1189-90 (9th Cir. 2024).

The Court also should reject Defendants' argument that a separate risk disclosure in the November 2024 Form 10-K somehow revealed that Skyworks had lost a content position on the upcoming iPhone 17. DB 18. While the market knew by November 2024 of the content loss on the ***iPhone 16***, nothing in the "additional language" on page 18 of Defendants' brief explains that Skyworks had, in fact, lost content on the ***iPhone 17***. A statement that Skyworks "could lose" market share in the future, when it already had lost market share on the upcoming model, is actionable. *In re Alphabet, Inc. Sec. Litig.,* 1 F.4th 687, 702-05 (9th Cir. 2021); *Facebook*, 87 F.4th at 949 ("This juxtaposition of a 'could occur' situation with the fact that the risk had materialized mirrors the allegations in the Facebook scenario.").

Defendants do not identify a single analyst who interpreted this disclosure as indicating that Skyworks would lose Apple content in the iPhone 17. Rather, based on later statements made by Defendants after the risk disclosure, analysts concluded the opposite. *See, e.g.*, ¶100 (Jan. 8, 2025 J.P. Morgan stating "we believe the team is poised to return to its historical average content growth of 10% at Apple"). Defendants provide no basis to accept their construction of how a reasonable investor would interpret the disclosure at this stage of the litigation.

## III.    THE COMPLAINT ALLEGES SCIENTER

Scienter is pled if "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). An inference is "strong" if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. At this stage, the court must "constantly assum[e] . . . plaintiff's allegations to be true," *id.* at 326-27, and draw all reasonable inferences in favor of the plaintiff. *Khoja*, 899 F.3d at 1008.

Defendants contend "there is not a single specific allegation in the CC that anyone at Skyworks, let alone Griffin or Sennesael, knew that the Company's content position would be lower for the iPhone 16 or 17 when the Challenged Statements were made. . . ." DB 19. This "specific allegation" argument misstates the scienter pleading standard, which does not require allegations that are "irrefutable" or "of the 'smoking gun' genre." *Tellabs,* 551 U.S. at 324. "Importantly, '[s]cienter can be established by direct or circumstantial evidence.'" *Davis v. Yelp, Inc*., 2021 WL 4923359, at *12 (N.D. Cal. Sept. 17, 2021). At this stage, Plaintiff need only allege particular facts giving rise to a strong inference of scienter, "not to produce admissible evidence." *McKesson*, 126 F. Supp. 2d at 1272.

Here, the Complaint includes ample facts establishing that the most plausible—indeed, only plausible—inference was that Defendants knew that Apple informed Skyworks of its content decisions before they made the relevant false statements. These facts include information from former employees with personal knowledge of the iPhone manufacturing timeline and how Apple communicated content decisions to Defendants, disclosures from competitors of iPhone content wins, reports from industry insiders and analysts from leading financial institutions, and credible media sources. *Supra* at 8-12. Such allegations give rise to an inference that Defendants knew of Apple's content decisions when they spoke about

Skyworks's content position, *Quality Sys.*, 865 F.3d at 1145-46, particularly since such information was critical to the Company. Further, even if Defendants somehow did not know this information, their disregard of such information before speaking about Skyworks's so-called positive execution, their lack of any concerns, and iPhone 17 content gains would be deliberately reckless. *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (deliberate recklessness exists when a defendant "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort").

Defendants' argument of "pure speculation," DB 20, disregards the corroborative timeline allegations and ignores that courts must "consider the totality of circumstances" when evaluating scienter, including circumstantial evidence, and cannot "close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Likewise, Skyworks's new (and current) CEO's admission in March 2025 that, *over the last three years*, the Company had not "been growing our content," that "we haven't been performing that well," and that the Company had not delivered "the best product" and had become "too complacent," ¶¶124-26, furthers a scienter inference. So too does Griffin's abrupt resignation the same day as the February 2025 corrective disclosure, as well as Sennesael's the next quarter. *In re Fibrogen, Inc.*, 2022 WL 2793032, at *25 (N.D. Cal. July 15, 2022) ("abrupt resignation tends to support scienter and may be considered together with other allegations . . . because scienter is reviewed holistically."); *In re Banc of California Sec. Litig.*, 2017 WL 3972456, at *8 (C.D. Cal. Sept. 6, 2017) (finding that the defendant's resignation "'add[s] one more piece to the scienter puzzle.'").

Moreover, supplying content for the iPhone was "the critical core operation" at Skyworks. *Reese*, 747 F.3d at 569. The Complaint pleads in detail Defendants' understanding of Apple's outsized importance to Skyworks. *Cf.* DB 19-20. Apple

sales comprised well over 60% of Skyworks's annual revenue, and iPhone content comprised approximately 85% of those sales. Defendants also routinely referred to Apple as the Company's largest and most important customer, ¶¶4, 35, 191, and they recognized that the "core business" was to "always protect[] and defend[]" Apple. ¶168. These allegations, therefore, amply satisfy the "core operations" standard to infer scienter. *Berson*, 527 F.3d at 987-88; *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003).

Considered holistically, the Complaint thus alleges a strong inference that Defendants were aware of, but misled investors about, the true status of Skyworks's content in the iPhone 16 and iPhone 17. *Alphabet*, 1 F.4th at 706-07.

Defendants' "motive" argument, DB 19-20, is unavailing. Motive allegations are not required to allege scienter. *Id*. at 707; *see also Am. W. Holding Corp.*, 320 F.3d at 944 ("the lack of stock sales by a defendant is not dispositive as to scienter."). Further, *Nguyen v. Endologix, Inc*., 962 F.3d 405 (9th Cir. 2020), is inapposite. The false statements in *Nguyen* concerned the likelihood of FDA approval for a single-device medical startup, in which the plaintiff's scienter theory was that the defendants knew that there was "absolutely no hope" of FDA approval. The Court found that specific theory not as plausible as the opposing inference that the company would not have staked its existence on a trial that was "doomed to fail." 962 F.3d at 415-16. Subsequent courts have limited *Nguyen* to its specific facts and found scienter adequately pleaded where, like here, it is as equally plausible that "defendants knew that they were withholding material information" than that their misstatements were the product of an innocent mistake. *In re BioMarin Pharm. Inc. Sec. Litig*., 2022 WL 164299, at *12-14 (N.D. Cal. Jan. 6, 2022) (rejecting *Nguyen*-based argument that "attacks a straw man" in a case where defendants told "the market things that were allegedly not true and that [they] must have known were not true by their nature"); *Skiadas v. Acer Therapeutics, Inc*., 2020 WL 4208442, at *8 (S.D.N.Y. July 21, 2020) (rejecting *Nguyen* argument as "just old wine in a new

bottle" in case where plaintiff's "theory is that Defendants knew that the FDA had not agreed to approve [the drug] but that they chose to say the opposite"); *Fibrogen*, 2022 WL 2793032, at *18 (*Nguyen* inapplicable to the misrepresentation of known issues).

Further, Defendants' actions in concealing the content losses for as long as possible are not implausible or necessarily irrational. Skyworks was a multi-product company that repeatedly "told the market that it was focused on diversifying its product base to guard against its dependence on Apple," *e.g.*, ¶3, and touted the strength of its supposedly broad portfolio just four weeks prior to the February 2025 corrective disclosure, *e.g.*, ¶¶98-100. Defendants may have concealed the truth as long as possible in the hope that their product diversification strategy would mitigate the disclosure of iPhone losses, which is consistent with a cogent inference of scienter. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008); *Skiadas*, 2020 WL 4208442, at *8 (crediting inference of a rational gamble that good news might overtake bad news).

## IV.    PLAINTIFF ADEQUATELY ALLEGES A SECTION 20(A) CLAIM

Finally, the Complaint alleges in detail that Defendants Griffin and Sennesael were the Company's top executive leaders who shared responsibility for the Company's important strategic decisions, for the accuracy of the Company's SEC filings (which they signed), and for the Company's communications with investors. ¶¶29-31, 128, 131-32, 135-36, 138, 140, 142-43, 145, 148-49, 151, 220-28. Such allegations are by no means "conclusory," DB 22; rather, they readily satisfy §20(a) at the pleading stage. *See, e.g.*, *Ryvyl*, 2024 WL 4536471, at *15.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Motion.

Dated: November 18, 2025

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3481

-and-

John Rizio-Hamilton (admitted *pro hac vice*)
johnr@blbglaw.com
Robert Kravetz (admitted *pro hac vice*)
robert.kravetz@blbglaw.com
Abygail Kritta (admitted *pro hac vice*)
abygail.kritta@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel:    (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund and the proposed class*