**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

John Rizio-Hamilton (admitted *pro hac vice*)
johnr@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400

*Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund and the proposed class*

[Additional counsel on signature block.]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SKYWORKS SOLUTIONS, INC. SECURITIES LITIGATION | Case No. 8:25-cv-00411-DOC-JDE<br><br><u>CLASS ACTION</u><br><br>**LEAD PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>Assigned to: Hon. David O. Carter<br>Date: February 22, 2027<br>Time: 8:30 a.m.<br>Courtroom 10A, 10th Floor |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# NOTICE OF MOTION

TO DEFENDANTS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, pursuant to the Court's Order of Hearing on Motion for Class Certification (Dkt. No. 96-1), on February 22, 2027, at 8:30 a.m., in the Courtroom of the Honorable David O. Carter, Louisiana Sheriffs' Pension & Relief Fund ("Lead Plaintiff") will and hereby does respectfully move this Court, pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and (g), for entry of an order in the above-captioned action (the "Action"):

1. Certifying a class of investors (the "Class") defined as:

> All persons or entities who purchased or otherwise acquired the common stock of Skyworks Solutions, Inc. (Nasdaq: "SWKS") between August 7, 2023 and February 5, 2025, inclusive ("Class Period"), and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Skyworks during the Class Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) the subsidiaries and affiliates of Skyworks; (vi) Skyworks's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

2. Appointing Lead Plaintiff as Class Representative; and

3. Approving Lead Plaintiff's selection of Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as Class Counsel.

This motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities in support thereof ("Motion"); the accompanying Declaration of John Rizio-Hamilton (the "Rizio-Hamilton Declaration") and all exhibits attached thereto; the papers and pleadings filed in this Action; and such further matters and argument as the Court may consider at the hearing on this Motion.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on November 5, 2026.

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... iii

GLOSSARY ..... vii

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 2

A. Nature of the Action ..... 2

1. Heading into the Class Period, Skyworks's Commercial Relationship With Apple Was Troubled and Its Content Position Was Severely at Risk ..... 3

2. The Class Period Commences With Content Losses ..... 4

3. Content Losses Snowball ..... 6

4. February 5, 2025: The Full Truth Is Revealed ..... 7

B. Procedural History ..... 8

III. ARGUMENT ..... 9

A. The Proposed Class Satisfies All Requirements of Rule 23(a) ..... 9

1. The Proposed Class is Sufficiently Numerous ..... 9

2. The Proposed Class Demonstrates Commonality ..... 10

3. Typicality Is Established ..... 10

4. Adequacy Is Established ..... 11

B. The Proposed Class Satisfies Predominance and Superiority ..... 12

1. Common Factual and Legal Questions Predominate ..... 13

a. The Fraud-On-The-Market Presumption of Reliance Applies ..... 13

(1) High Weekly Trading Volume (*Cammer* 1) ..... 14

(2) Significant Analyst Coverage (*Cammer* 2) ..... 15

(3) Market Makers (*Cammer* 3) ..... 15

(4) S-3 Registration Eligibility (*Cammer* 4) ..... 15

(5) Cause-and-Effect Relationship (*Cammer* 5) ..... 16

(6) Market Capitalization (*Krogman* 1) ....... 17

(7) Bid-Ask Spread (*Krogman* 2) ....... 17

(8) Public Float (*Krogman* 3) ....... 18

(9) Additional Indicia of Market Efficiency ....... 18

b. Damages Will Be Calculated Using a Common Methodology That Is Consistent with Lead Plaintiff's Class-Wide Theory of Liability ....... 19

2. Class Adjudication is Superior to Other Available Methods ....... 21

C. Bernstein Litowitz Should Be Appointed Class Counsel ....... 22

D. Defendants' Anticipated Defenses Fail ....... 22

1. There is a Unified Class Period ....... 22

2. There is No "Conflict" Defeating Certification ....... 24

IV. CONCLUSION ....... 25

# TABLE OF AUTHORITIES


Page(s)

**CASES**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 13

*AMI - Gov't Emps. Provident Fund Mgmt. Co. v. Alphabet Inc.*,
833 F. Supp. 3d 1034 (N.D. Cal. 2026) .......... 18, 19, 20

*Angley v. UTi Worldwide Inc.*,
311 F. Supp. 3d 1117 (C.D. Cal. 2018) .......... 14, 18

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) .......... *passim*

*In re BofI Holding, Inc. Sec. Litig.*,
2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) .......... 12

*Borteanu v. Nikola Corp.*,
348 F.R.D. 239 (D. Ariz. 2025) .......... 17, 18, 21

*Brown v. China Integrated Energy Inc.*,
2015 WL 12720322 (C.D. Cal. Feb. 17, 2015) .......... 16

*Buttonwood Tree Value Partners, LP v. Sweeney*,
2013 WL 12125980 (C.D. Cal. Sept. 12, 2013) .......... 24

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .......... 14, 15, 16, 18

*In re Cendant Corp. Litig.*,
182 F.R.D. 476 (D.N.J. 1998) .......... 23

*In re China Med. Corp. Sec. Litig.*,
2013 WL 12126754 (C.D. Cal. May 16, 2013) .......... 11

*City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) .......... 20

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2022 WL 1459567 (N.D. Cal. May 9, 2022) .......... 12

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................19, 20

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015)....................10

*In re Connetics Corp. Sec. Litig.*,
257 F.R.D. 572 (N.D. Cal. 2009)....................23

*In re Cooper Cos. Inc. Sec. Litig.*,
254 F.R.D. 628 (C.D. Cal. 2009)....................21

*Crews v. Rivian Auto., Inc.*,
2024 WL 3447988 (C.D. Cal. July 17, 2024)....................*passim*

*Cullen v. RYVYL Inc.*,
2025 WL 2836651 (S.D. Cal. Aug. 20, 2025)....................9

*Di Donato v. Insys Therapeutics, Inc.*,
333 F.R.D. 427 (D. Ariz. 2019)....................18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................13

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)....................15, 17, 18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)....................13

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)....................11

*Junge v. Geron Corp.*,
2022 WL 1002446 (N.D. Cal. Apr. 2, 2022)....................17, 20

*Katz v. China Century Dragon Media, Inc.*,
287 F.R.D. 575 (C.D. Cal. 2012)....................21

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001)....................14, 17, 18

*LaFrano v. Loandepot, Inc.*,
2023 WL 12023569 (C.D. Cal. Dec. 8, 2023)....................13

*Loritz v. Exide Techs.*,
2015 WL 6790247 (C.D. Cal. July 21, 2015)....16

*Malriat v. QuantumScape Corp.*,
2022 WL 17974629 (N.D. Cal. Dec. 19, 2022)....17

*In re Med. Cap. Sec. Litig.*,
2011 WL 5067208 (C.D. Cal. July 26, 2011) (Carter, J.)....25

*Milbeck v. TrueCar, Inc.*,
2019 WL 2353010 (C.D. Cal. May 24, 2019)....13

*In re NetSol Techs., Inc. Sec. Litig.*,
2016 WL 7496724 (C.D. Cal. July 1, 2016)....9

*Pardi v. Tricida, Inc.*,
2024 WL 4336627 (N.D. Cal. Sept. 27, 2024)....10

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014)....10

*Petrie v. Elec. Game Card, Inc.*,
308 F.R.D. 336 (C.D. Cal. 2015) (Carter, J.)....15, 18, 24

*Pino v. Cardone Cap., LLC*,
830 F. Supp. 3d 1013 (C.D. Cal. 2026)....11, 21

*Purple Mountain Tr. v. Wells Fargo*,
2022 WL 3357835 (N.D. Cal. Aug. 15, 2022)....18

*S. Ferry LP No. 2 v. Killinger*,
271 F.R.D. 653 (W.D. Wash. 2011)....23, 25

*Sayce v. Forescout Techs., Inc.*,
754 F. Supp. 3d 878 (N.D. Cal. 2024)....23

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
2025 WL 1243818 (N.D. Cal. Apr. 25, 2025)....*passim*

*In re Silver Wheaton Corp. Sec. Litig.*,
2017 WL 2039171 (C.D. Cal. May 11, 2017)....*passim*

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
341 F.R.D. 542 (S.D.N.Y. 2022)....25

*In re STEC Inc. Sec. Litig.*,
2012 WL 6965372 (C.D. Cal. Mar. 7, 2012)....................................................21

*Todd v. STAAR Surgical Co.*,
2017 WL 821662 (C.D. Cal. Jan. 5, 2017)...................................................1, 18

*In re Twitter Inc. Sec. Litig.*,
326 F.R.D. 619 (N.D. Cal. 2018)...........................................................12, 15, 24

*Valentino v. Carter-Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996)..........................................................................21

*Weston v. DocuSign, Inc.*,
348 F.R.D. 354 (N.D. Cal. 2024).................................................................19, 20

**STATUTES**

Section 10(b) of the Securities Exchange Act ...................................................13, 20

**OTHER AUTHORITIES**

17 C.F.R. § 239.13 ..........................................................................................16

Fed. R. Civ. P. 23 ........................................................................................1, 9, 25

Fed. R. Civ. P. 23(a)...................................................................................*passim*

Fed. R. Civ. P. 23(b) ..................................................................................*passim*

Fed. R. Civ. P. 23(g) .........................................................................................22

# GLOSSARY

| Term | Definition |
|---|---|
| **Class** | All persons or entities who purchased or otherwise acquired Skyworks common stock between August 7, 2023 and February 5, 2025, inclusive, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Skyworks during the Class Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) the subsidiaries and affiliates of Skyworks; (vi) Skyworks's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such. |
| **Company or Skyworks** | Skyworks Solutions, Inc. |
| **Defendants** | Griffin, Sennesael, and Skyworks |
| **Griffin** | Defendant and Former Skyworks CEO Liam K. Griffin |
| **Lead Counsel** | Bernstein Litowitz Berger & Grossmann LLP |
| **Lead Plaintiff or Louisiana Sheriffs** | Louisiana Sheriffs' Pension & Relief Fund |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| **RF** | Radio frequency |
| **RFFE** | RF front-end, the category of iPhone components Skyworks supplies to Apple |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| Term | Definition |
| --- | --- |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| **Sennesael** | Defendant and Former Skyworks CFO Kris Sennesael |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This is a securities fraud case brought by Lead Plaintiff against Skyworks Solutions, Inc., its former CEO, Liam K. Griffin, and its former CFO, Kris Sennesael, on behalf of all persons or entities who purchased Skyworks common stock from August 7, 2023 through February 5, 2025, inclusive (the "Class Period").[1]

Lead Plaintiff alleges that Defendants misled investors throughout the Class Period that Skyworks's relationship with its key customer, Apple, was secure and that the Company's content position in supplying chipset components for iPhones was stable. In reality, Defendants knew that Skyworks had lost, or was at significant risk of losing, a material content position in upcoming iPhone cycles at the time they made the alleged misstatements. Courts in the Ninth Circuit have observed that securities class actions "fit Rule 23 'like a glove,'" and this case is no exception. *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *3 (C.D. Cal. Jan. 5, 2017). For reasons set forth herein, the Class meets all of Rule 23's requirements.

***First***, Lead Plaintiff satisfies Federal Rule of Civil Procedure 23(a)'s prerequisites—numerosity, commonality, typicality, and adequacy. The Class consists of thousands of investors whose claims arise under the same federal securities laws and concern the same alleged conduct by Defendants. Lead Plaintiff is an institutional investor who acquired Skyworks stock throughout the Class Period and is adequate to serve as Class Representative. Further, Lead Counsel has extensive experience prosecuting securities fraud class actions.

---

[1] Unless otherwise noted herein: (i) capitalized terms and abbreviations have the same meanings as in the Consolidated Class Action Complaint (the "Complaint") (Dkt. No. 59); (ii) references to "¶__" are to paragraphs of the Complaint; (iii) all emphasis is added; (iv) all internal citations and punctuation are omitted; and (v) references to "Ex. __" are to exhibits to the accompanying Rizio-Hamilton Declaration.

***Second***, the Class satisfies Rule 23(b)(3). As shown in the Expert Report of Jonah B. Gelbach ("Gelbach Report" or "Ex. 1"), the market for Skyworks common stock was efficient during the Class Period. Reliance may thus be presumed classwide. The Gelbach Report also shows that damages may be calculated classwide using a well-established methodology consistent with Lead Plaintiff's theory of liability. And a class action is superior to other methods of adjudicating the claims of thousands of geographically dispersed Class members.

Lead Plaintiff respectfully requests that the Court certify the proposed Class.

## II. STATEMENT OF FACTS

### A. Nature of the Action

Skyworks develops and manufactures semiconductor components, including RF front-end modules that it has supplied to Apple Inc. ("Apple") for every iPhone generation. ¶¶2, 26, 33-35. Apple is Skyworks's self-described "largest" and "most important" customer, and iPhone component sales to Apple generate nearly 70% of the Company's revenue. ¶¶3, 27, 35. Market participants therefore focused intensely on Skyworks's relationship with Apple and its content position in each successive iPhone, recognizing that "it would be a catastrophic blow to Skyworks if it were to ever miss out on a future iPhone design cycle." ¶¶4, 36-37.

During the selection cycles for iPhones to be launched in 2024 and 2025, Defendants repeatedly assured the market that Skyworks's content position with Apple was secure, telling market participants that there was "nothing to worry about" the Company's relationship with Apple, that the "back and forth" with Apple "is always going our way," and that Skyworks expected to grow content by 10% as in past iPhone cycles. These representations were false and misleading. Although discovery is still in its early stages, even the limited evidence adduced to date shows that Defendants knew that the Apple/Skyworks commercial relationship had deteriorated significantly, and that Skyworks's content positions had been lost or were, at minimum, severely at risk.

### 1. Heading into the Class Period, Skyworks's Commercial Relationship With Apple Was Troubled and Its Content Position Was Severely at Risk

One of the most valuable iPhone components Skyworks manufactured was the [redacted], which is the iPhone component that Skyworks lost share to Broadcom on 2025 iPhones. Skyworks began [redacted] for the iPhone 16 in July 2022—over two years before the phone's expected launch. Ex. 6. In every testing phase of the [redacted] *Id.* [redacted] Ex. 7.

In spring 2023, [redacted] Ex. 8 at -498. Given Skyworks's existing performance issues, Skyworks executives realized they were [redacted] on the part to Broadcom due to earlier failures and a [redacted] and that [redacted] *Id.* at -497. A Skyworks executive forwarded the email [redacted], stating that [redacted] *Id.*

The team did not. Even after the transition, [redacted] remained far behind its competitors. A July 24, 2023 email recognized that [redacted] Ex. 9 at -411 (emphasis in original). Yet on Skyworks's earnings call on August 7, 2023 (the first day of the Class Period), in response to a question about "what percentage of revenue came from your largest customer," Defendant Sennesael answered: "[W]e continue to win big with that large customer," including "not just at the phone but in every product that they have and every product that they brought to the market and that they will bring to the future." ¶65.

### 2. The Class Period Commences With Content Losses

As the Class Period commenced, Skyworks learned that it had lost content on another critical part: the [redacted], which is the iPhone 16 component that Apple awarded to Qualcomm. On September 18, 2023, [redacted]—[redacted]. Ex. 10 at -901. Those topics previously discussed included [redacted] *Id.* [redacted] Ex. 11.

[redacted] In a September 20, 2023 email, one Skyworks executive [redacted] Ex. 12 at -563. In a subsequent message, he estimated the [redacted] and said [redacted] Ex. 13. On September 29, 2023, after receiving an email that [redacted] Ex. 14 at -591, -593. A November 16, 2023 presentation stated that [redacted] Ex. 15.

Meanwhile, Skyworks continued to receive negative news on the [redacted]—the key part at issue in the iPhones 16SE and 17 to be released in 2025. On August 20, 2023, [redacted] Ex. 12 at -563. By early October 2023, [redacted]

[redacted] Ex. 16. On October 6, 2023, a Skyworks executive [redacted] Ex. 17. An October 28, 2023 email titled [redacted] Ex. 18 at -387-88.

Despite all of this, Defendants misled investors about the stability of the Company's content position with Apple. For example, on an earnings call on November 2, 2023, in response to a specific question about ***growing content by 10%***, Griffin responded, "Our teams together ***are executing in an outstanding way, and we're committed to growth*** and diversification and certainly matching the challenges with our top tier customers." ¶¶131-32. And in the Company's November 17, 2023 annual report, Defendants presented content losses as a hypothetical risk, even though Skyworks had already lost the critical [redacted] component to Qualcomm. ¶¶148, 150.

The Apple/Skyworks relationship continued to deteriorate. On January 30, 2024, [redacted] that there was [redacted] and that there were [redacted] Ex. 19. That same day, though, when an analyst asked Defendant Griffin whether Skyworks "may be losing content at your largest customer in the second half of the year," Griffin responded: "***I think we have a great position with our largest customer. Nothing really is concerning on that point***, and we know exactly who we are and who they are, and we have great partnerships. And ***we'll continue to drive success***." ¶¶134-36. Defendants also issued an SEC Form 10-Q presenting content losses as hypothetical, when those

losses had already occurred. ¶¶150-52. Similarly, on March 5, 2024, when asked why he was "quite hopeful on the content going up a lot more," Griffin told investors that the "larger customer definitely prefers the kind of things that we do," and that there was "nothing that we really can't handle." ¶¶138.

On April 30, 2024, Defendants were forced to partially disclose the truth: Skyworks had lost approximately 10% of its content position in the iPhone 16 (which was due to the loss of the [redacted] component). ¶¶76-78. Skyworks stock fell from $106.59 to $90.30—a decline of approximately 15% in a single trading day. ¶80. Analysts immediately attributed the decline to Skyworks's disclosure of its lost content position. So did Defendants. Ex. 20 (May 3, 2024 email to [redacted] entitled [redacted] stating [redacted]). Defendants nevertheless sought to contain the damage. When an analyst asked whether the news "might signal a move to sort of multi-sourcing strategy at that customer [Apple]," or whether it was "more limited to one year or one socket," Defendant Griffin answered categorically: "***It's one year, one socket for sure. And we have very, very good eyes on that***." ¶79. Analysts credited this reassurance. ¶¶86-87.

**3. Content Losses Snowball**

It was not "one year, one socket." As noted above, ***as early as*** [redacted], Skyworks knew that ***the*** [redacted] ***was*** [redacted] for the dominant iPhone 17 model (Sutter), to be released in September 2025. Ex. 15.

Additional content losses continued to snowball behind the scenes. By January 9, 2024—before Griffin told investors that there was "nothing concerning" with the Apple relationship, and before he assured investors that "***It's one year, one socket for sure***," ¶79—an email recounting a conversation with [redacted] concerning the [redacted] stated [redacted] for the upcoming [redacted] Ex. 21. Likewise, an internal Skyworks presentation dated March 19, 2024 recorded the [redacted]

[redacted] and described the [redacted] Ex. 22 at 5, 7, 10. The next day, a Skyworks executive texted [redacted] Ex. 23. And on April 12, 2024, another Skyworks executive confirmed that the [redacted] that there would be [redacted], and that [redacted] Ex. 24.

A June 19, 2024 internal email [redacted] Ex. 25. On July 3, 2024, a Skyworks employee reported that [redacted]—which is what happened. Ex. 26.

Yet Defendants did not even hint at content losses. Rather, they continued to mislead investors. On the November 12, 2024 earnings call, in response to a question about 2025 Apple content, Defendant Griffin told investors that the "***back and forth is always going our way***" with Apple and that Skyworks had "***the confidence of our most important customer***." ¶¶95-97. Skyworks's November 15, 2024 Form 10-K also continued to present known content losses as hypothetical. ¶¶149-50. And in meetings with analysts on January 8, 2025, Sennesael inexplicably "highlighted positive tailwinds from [the] Apple design process," stated that the iPhone 15 and 16 were "aberration years," and suggested that Skyworks management "sees content "ASP [Average Selling Price] back to historical average 10%/year growth," led in part by the [redacted]—the part that Skyworks had declared [redacted] ¶¶142-43; Ex. 15; *see also* ¶145 (J.P. Morgan analysts stating that "Skyworks had a 'Strong iPhone opportunity and return to 10% average RF content growth[:]'").

### 4. February 5, 2025: The Full Truth Is Revealed

The full truth emerged on February 5, 2025, when Defendants disclosed more

content losses. ¶¶102-09. During a quarterly call with analysts, Defendant Sennesael disclosed that Skyworks's content position in iPhones to be released in 2025 was expected to be down 20% to 25%, which would "start impacting [Skyworks's] revenue in the fourth quarter of fiscal 2025 and throughout fiscal 2026." ¶¶104-07. Sennesael explained that the content loss was due to Apple's decision to "dual source[] on one important part," ¶¶104-08, i.e., the [redacted], and he finally admitted that Skyworks would not "win back" the sockets lost to Qualcomm in connection with the "Qualcomm modem," ¶108.

These disclosures caused Skyworks's stock price to plummet from a closing price of $87.08 on February 5, 2025 to $65.60 on February 6, 2025—a decline of approximately 25% in one day. ¶110. Analysts expressed surprise. ¶¶112-22. Summarizing the market's reaction, [redacted] Ex. 27.

On the same call, Griffin announced that he was resigning, effective February 17, 2025; Sennesael followed him at the end of the next quarter. ¶103. Weeks after the final disclosure, Skyworks's new CEO, Philip Brace, candidly admitted that Skyworks had not "been performing that well" over the past three years, and that Skyworks had not delivered "the best product," ¶¶123-26—facts known to Defendants since at least late 2022, nearly nine months before the Class Period began.

**B. Procedural History**

On May 16, 2025, the Court appointed Louisiana Sheriffs as Lead Plaintiff and approved its selection of Bernstein Litowitz as Lead Counsel. Dkt. No. 47. On July 31, 2025, Lead Plaintiff filed the Complaint. After full briefing and a hearing, the Court denied Defendants' Motion to Dismiss in full on May 6, 2026. Dkt. No. 81. On May 20, 2026, Defendants moved for reconsideration, Dkt. No. 84, which the Court denied, Dkt. No. 93.

Lead Plaintiff has actively pursued discovery, including negotiating an ESI protocol and protective order, serving document requests, negotiating over the scope of Defendants' production, reviewing Defendants' productions, and briefing two discovery motions. Lead Plaintiff has also served document subpoenas on three non-parties, responded to Defendants' discovery requests, and produced documents. Lead Plaintiff also supervised Lead Counsel in preparing for and conducting an unsuccessful mediation with Defendants on October 21, 2026.

## III. ARGUMENT

To obtain class certification, Lead Plaintiff must "satisfy the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the categories under Rule 23(b)." *Crews v. Rivian Auto., Inc.*, 2024 WL 3447988, at *3 (C.D. Cal. July 17, 2024). "[T]he law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws." *In re NetSol Techs., Inc. Sec. Litig.*, 2016 WL 7496724, at *3 (C.D. Cal. July 1, 2016); *see also Cullen v. RYVYL Inc.*, 2025 WL 2836651, at *5 (S.D. Cal. Aug. 20, 2025) (finding securities cases "particularly well-suited" to class treatment because "geographically dispersed shareholders with relatively small holdings" may not otherwise pursue their claims).

### A. The Proposed Class Satisfies All Requirements of Rule 23(a)

#### 1. The Proposed Class is Sufficiently Numerous

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "As a general rule ... classes of 40 or more are numerous enough." *In re Silver Wheaton Corp. Sec. Litig.*, 2017 WL 2039171, at *6 (C.D. Cal. May 11, 2017). For securities cases involving shares traded on a national exchange, courts infer numerosity where "several million shares of stock were purchased during the class period." *Id.* (collecting cases and finding numerosity satisfied when 5.5 million shares were exchanged daily).

Here, during the Class Period, Skyworks had between 159 million and 161

million shares of common stock outstanding, and the average weekly trading volume of the stock on Nasdaq equaled 7% of its outstanding shares. Ex. 1 ¶42 nn.42-43. The proposed Class satisfies the numerosity requirement.

**2. The Proposed Class Demonstrates Commonality**

Rule 23(a)(2) requires that "questions of law or fact" be common to the class. Fed. R. Civ. P. 23(a)(2). "The commonality requirement is construed liberally." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 972 (C.D. Cal. 2015). Indeed, Rule 23(a)(2) is satisfied "[s]o long as there is 'even a single common question'" of fact or law. *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014). "Securities class actions typically satisfy Rule 23(a)(2) because the cases 'involve the same basic legal claims: securities frauds,' and the 'legal claims are based on the same nucleus of operative facts: the alleged misrepresentations and omissions.'" *Crews*, 2024 WL 3447988, at *4.

Here, numerous questions are common to the proposed Class, including: (i) whether Defendants made material misrepresentations; (ii) whether Defendants acted with scienter; (iii) whether Skyworks's stock value was artificially inflated (and by how much); (iv) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses; and (v) whether Defendants Griffin and Sennesael controlled the conduct of Skyworks's business and its representations to the public. Courts routinely find that these or similar questions establish commonality. *See id.*; *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at *3 (N.D. Cal. Apr. 25, 2025); *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *4 (N.D. Cal. Sept. 27, 2024); *Silver Wheaton*, 2017 WL 2039171, at *7.

**3. Typicality Is Established**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether

other class members have been injured by the same course of conduct.'" *Silver Wheaton*, 2017 WL 2039171, at *7. The standard is met if the plaintiff's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also Crews*, 2024 WL 3447988, at *4 (class representative's claims "need not be substantially identical" to those of the class to satisfy typicality standard).

Here, Lead Plaintiff and the proposed Class suffered the same injury—purchasing Skyworks common stock at artificially inflated prices—as a result of the same misconduct—Defendants' false and misleading statements and omissions—and were damaged when the truth emerged on April 30, 2024 and February 5, 2025. Accordingly, the typicality requirement is satisfied. *See Silver Wheaton*, 2017 WL 2039171, at *7 (typicality satisfied when, "like all members of the proposed [c]lass, plaintiffs purchased Silver Wheaton common stock during the [c]lass [p]eriod and were allegedly damaged by the same misstatements and omissions by Silver Wheaton"); *Pino v. Cardone Cap., LLC*, 830 F. Supp. 3d 1013, 1023 (C.D. Cal. 2026) (typicality is "readily met" in securities fraud cases based on misrepresentations because the "misconduct alleged ... will almost always be the same" as to all class members).

**4. Adequacy Is Established**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The commonality, typicality, [and] adequacy-of-representation requirements 'tend to merge' with each other." *In re China Med. Corp. Sec. Litig.*, 2013 WL 12126754, at *3 (C.D. Cal. May 16, 2013) (finding adequacy). "The adequacy inquiry centers on two questions: '(1) do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Pino*, 830 F. Supp. 3d at 1023. Both prongs are satisfied here.

***First***, Louisiana Sheriffs, which does not have any conflicts with other class members (see Section D.2, infra), has vigorously prosecuted this Action and will continue to do so. Among other litigation tasks, Louisiana Sheriffs has reviewed and approved the Complaint and other filings; participated in discovery, by responding to discovery requests and producing documents; reviewed briefing regarding discovery issues; directed counsel in connection with the mediation; and received and reviewed regular reports from Lead Counsel regarding case developments. Ex. 2 ¶8; *see Crews*, 2024 WL 3447988, at *5 (institutional investor that "reviewed the [c]omplaint and various pleadings" and "received periodic updates and other correspondence" from class counsel satisfied adequacy requirement). Moreover, as a large institutional investor, Louisiana Sheriffs is precisely "the type of plaintiff typically favored under the PSLRA." *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *3 (S.D. Cal. Aug. 24, 2021); *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *5 (N.D. Cal. May 9, 2022) ("large institutional investor" adequate to represent class).

***Second***, Lead Counsel also satisfies the adequacy requirement. Lead Counsel has a proven record of success in complex securities fraud cases, having recovered billions of dollars on behalf of injured investors. *See* Ex. 4. Moreover, Lead Counsel has vigorously prosecuted the Class's claims to date. *See In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 628 (N.D. Cal. 2018) (appointed counsel "vigorously prosecuted th[e] case by investigating claims, preparing the complaint, defending the complaint against dismissal, conducting discovery, and pursuing class certification").

**B. The Proposed Class Satisfies Predominance and Superiority**

In addition to meeting the prerequisites of Rule 23(a), the proposed Class satisfies Rule 23(b)(3), which requires that (i) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available methods for fairly

and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**1. Common Factual and Legal Questions Predominate**

The Supreme Court has recognized that "[p]redominance is a test readily met" in securities fraud cases like this one. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also LaFrano v. Loandepot, Inc.*, 2023 WL 12023569, at *5 (C.D. Cal. Dec. 8, 2023) (same). "Considering whether 'questions of law or fact common to class members predominate' begins ... with the elements of the underlying cause of action." *Crews*, 2024 WL 3447988, at *6 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*")). The elements of a Section 10(b) claim, particularly misrepresentation, scienter, and economic loss, are "clearly susceptible to classwide proof." *Milbeck v. TrueCar, Inc.*, 2019 WL 2353010, at *4 (C.D. Cal. May 24, 2019).

Here, the common questions identified above, *see supra* Section III.A.2, go to each element of Lead Plaintiff's claims. Questions regarding the "reliance" element of Lead Plaintiff's claims are also common to the Class, as Lead Plaintiff need not prove each class member's reliance on Defendants' misrepresentations and omissions, and can instead invoke the fraud-on-the-market presumption to "establish[] reliance on a class-wide basis." *Crews*, 2024 WL 3447988, at *6.

**a. The Fraud-On-The-Market Presumption of Reliance Applies**

The fraud-on-the-market presumption derives from the established principle that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014). Accordingly, a proposed Class need not demonstrate reliance on an investor-by-investor basis if a lead plaintiff shows that the defendants' stock traded in an efficient market. *Halliburton I*, 563 U.S. at 811; *see also Silver Wheaton*, 2017 WL 2039171, at *14 ("entire Class

is entitled to the presumption of reliance" when efficiency is shown).

To analyze whether Skyworks's stock traded on an efficient market, Lead Plaintiff retained Professor Jonah B. Gelbach, an economist and the Herman F. Selvin Professor of Law at the University of California, Berkeley School of Law. Ex. 1 ¶6 & App. A. Professor Gelbach holds a Ph.D. in economics from MIT and a J.D. from Yale. *Id.* ¶8. He was a tenured professor of economics at the University of Maryland and the University of Arizona before joining the law faculties of the University of Pennsylvania and UC Berkeley. *Id.* Professor Gelbach is a prolific author who has published multiple articles regarding econometric methods, including those relating to the use of event studies in securities litigation. *Id.*

"To assess whether a market was efficient, the Ninth Circuit refers to the factors outlined in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)." *Crews*, 2024 WL 3447988, at *8. Courts also consider the factors set out in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). *See Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018) (applying so-called "*Krogman* factors"). As documented in the Gelbach Report and described below, applying the *Cammer* and *Krogman* factors here supports a finding that Skyworks's stock traded on an efficient market, such that the fraud-on-the-market presumption of reliance applies.

**(1) High Weekly Trading Volume (*Cammer* 1)**

"[T]he existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market [] because it implies significant investor interest in the company." *Crews,* 2024 WL 3447988, at *9. "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security [was] an efficient one." *Cammer*, 711 F. Supp. at 1293. Skyworks's average weekly trading volume during the Class Period equaled 7% of its outstanding shares. Ex. 1 ¶42. This figure is far greater than the 2% needed to support a finding of market efficiency. *Cammer*, 711 F. Supp. at 1293; *see also SEB Inv.*, 2025 WL 1243818, at *7 (3.4%

rate supported market efficiency); *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *9 (N.D. Cal. Mar. 11, 2024) (4.65% rate supported market efficiency).

**(2) Significant Analyst Coverage (*Cammer* 2)**

"Another factor supporting market efficiency is where 'a significant number of securities analysts followed and reported on a company's stock during the class period.'" *Crews*, 2024 WL 3447988, at *9 (quoting *Cammer*, 711 F. Supp. at 1286). Skyworks's stock was the subject of more than 400 analyst reports during the Class Period, issued by at least 29 analyst firms, including such significant firms as Bank of America, BNP Paribas, Barclays, Goldman Sachs, J.P. Morgan, and UBS. Ex. 1 ¶46. These reports regularly appeared on the dates Skyworks released financial results, analyzed developments pertinent to this litigation, and adjusted price targets in response to new information. *Id.* ¶48. This extensive coverage of Skyworks's stock and corporate operations supports a finding that the stock traded on an efficient market. *See Banc of Cal.*, 326 F.R.D. at 649 (coverage by a dozen securities analysts plus press coverage supported market efficiency).

**(3) Market Makers (*Cammer* 3)**

"The next *Cammer* factor is the 'existence of market makers ...' who 'react swiftly to company news and reported financial results.'" *Crews*, 2024 WL 3447988, at *10 (quoting *Cammer*, 711 F. Supp. at 1286-87). "The more market-makers for a particular security (and, relatedly, the greater the volume of the security the market-makers are prepared to handle), the more reasonable it is to infer that the security is liquid, and, therefore, more likely the market for that security is efficient." *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 351 (C.D. Cal. 2015) (Carter, J.). Here, there were 147 market makers and brokers for Skyworks's common stock during the Class Period. Ex. 1 ¶52. Comparable or smaller numbers of market makers support market efficiency. *See Petrie*, 308 F.R.D. at 351 (between 24 and 32 market makers).

**(4) S-3 Registration Eligibility (*Cammer* 4)**

The fourth *Cammer* factor is eligibility "to file an S-3 Registration

Statement." *Cammer*, 711 F. Supp. at 1287. Form S-3 eligibility requires 12 months of SEC reporting, timely SEC filings, and a market capitalization of at least $75 million. 17 C.F.R. § 239.13. This factor reflects "the [SEC's] belief that the market operates efficiently" for companies that meet these requirements, regardless of whether they actually file Form S-3 statements. *Brown v. China Integrated Energy Inc.*, 2015 WL 12720322, at *17 (C.D. Cal. Feb. 17, 2015). Here, Skyworks met each Form S-3 registrant requirement during the Class Period. Ex. 1 ¶¶55-56. Indeed, Skyworks filed a Form S-3 on May 10, 2021, certifying that it met all requirements for filing on Form S-3. *Id.* ¶56. Accordingly, this factor favors market efficiency.

**(5) Cause-and-Effect Relationship (*Cammer* 5)**

"The final *Cammer* factor is the existence of 'a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.'" *Crews*, 2024 WL 3447988, at *10 (quoting *Cammer*, 711 F. Supp. at 1287). "The most common empirical test for a causal connection is an event study, which attempts to calculate the effect of an event on the value of the stock of a company." *Loritz v. Exide Techs.*, 2015 WL 6790247, at *11 (C.D. Cal. July 21, 2015). Here, Professor Gelbach's event study confirms this relationship. He examined the seven Class Period dates on which Skyworks released quarterly earnings after the market closed ("Earnings-News Dates"), using a regression model that controls for market-wide movements and industry movements, and he compared Skyworks's abnormal returns from ordinary dates to abnormal returns from Earnings-News Dates. Ex. 1 ¶¶59, 69-74 & Table 2. Five of the seven Earnings-News Dates showed abnormal returns that were statistically significant at the 95% confidence level, and three were significant at the 99% level, when using a conventional Student's *t* testing approach. *Id.* ¶¶76-77 & Table 3. Those results held under a "sample quantiles" method, developed in Professor Gelbach's peer-reviewed scholarship, that does not depend on the assumption that abnormal returns are normally distributed. *Id.* ¶¶79-80 & Table 4. Professor Gelbach therefore concluded

that Skyworks stock "responded to earnings news on the first possible trading date after the news was made public." *Id.* ¶81.

These findings support a finding of market efficiency. *See SEB Inv.*, 2025 WL 1243818, at *7 (fraud-on-the-market presumption favored by event study showing that statistically significant price movements occurred more frequently on financial information release days than on non-release days); *Borteanu v. Nikola Corp.*, 348 F.R.D. 239, 257 (D. Ariz. 2025) (fraud-on-the-market presumption favored by event study showing that three out of defendant's four earnings releases were "associated with a statistically significant [c]ompany-specific return"); *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022) (fraud-on-the-market presumption favored by event study showing statistical significance on dates announcing earnings or product development updates).

**(6) Market Capitalization (*Krogman* 1)**

Market capitalization "may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Here, Skyworks's market capitalization averaged $15.9 billion during the Class Period. Ex. 1 ¶85. This figure shows that Skyworks was highly capitalized during the Class Period and thus supports a finding of market efficiency. *See Junge v. Geron Corp.*, 2022 WL 1002446, at *4-5 (N.D. Cal. Apr. 2, 2022) (average market capitalization of $731.69 million); *Borteanu*, 348 F.R.D. at 258 (average market capitalization of $230.5 million).

**(7) Bid-Ask Spread (*Krogman* 2)**

The bid-ask spread is "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478. "[N]arrow bid-ask spreads support[] a finding of efficiency" because they indicate there are as many ready buyers as there are ready sellers. *FibroGen*, 2024 WL 1064665, at *11. Here, Skyworks's bid-ask spread averaged 0.03% during the Class Period. Ex. 1 ¶86. By comparison, the

average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database, which comprises all stocks traded on U.S. exchanges, was 0.70%. *Id.* The bid-ask spread thus weighs in favor of market efficiency. *See Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 441 (D. Ariz. 2019) (spread averaging between 0.12% and 0.36%); *SEB Inv.*, 2025 WL 1243818, at *7 (0.02%).

**(8) Public Float (*Krogman* 3)**

The final *Krogman* factor is the "public float," meaning "the percentage of shares held by the public rather than insiders." *FibroGen*, 2024 WL 1064665, at *11. "A high level of float weighs toward a finding of market efficiency." *Borteanu*, 348 F.R.D. at 258. Here, the minimum free float of Skyworks stock during the Class Period was 99.65% of shares outstanding, meaning that the public held the substantial majority of Skyworks stock. Ex. 1 ¶87. Courts have found smaller public floats sufficient. *See Di Donato*, 333 F.R.D. at 441 (87.2% public float); *Petrie*, 308 F.R.D. at 357 (approximately 87% float); *Purple Mountain Tr. v. Wells Fargo*, 2022 WL 3357835, at *5 (N.D. Cal. Aug. 15, 2022) (approximately 90% float).

**(9) Additional Indicia of Market Efficiency**

Beyond satisfying all of the *Cammer* and *Krogman* factors, Skyworks's shares traded on Nasdaq, one of the world's largest and most liquid stock exchanges. Ex. 1 ¶¶31, 34. That Skyworks common stock traded on Nasdaq "further demonstrates the market for [Skyworks] shares was efficient." *Angley*, 311 F. Supp. 3d at 1121 n.4; *see also Todd*, 2017 WL 821662, at *7 (Nasdaq listing "strong indicator" of market efficiency); *AMI - Gov't Emps. Provident Fund Mgmt. Co. v. Alphabet Inc.*, 833 F. Supp. 3d 1034, 1042 (N.D. Cal. 2026) (Nasdaq is a "quintessentially efficient market").

***

In sum, the market for Skyworks shares was efficient throughout the Class Period. As a result, Lead Plaintiff's claims are entitled to the "fraud-on-the-market" presumption of reliance, further supporting a finding of predominance.

#### b. Damages Will Be Calculated Using a Common Methodology That Is Consistent with Lead Plaintiff's Class-Wide Theory of Liability

Once the common questions are resolved, all that will remain is computing each Class member's damages, which in securities cases is "mechanical." *Blackie v. Barrack*, 524 F.2d 891, 905, 908-10 (9th Cir. 1975). Lead Plaintiff must show that damages "are capable of measurement on a classwide basis" using a common methodology that is consistent with Lead Plaintiff's theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). At class certification, "[t]he question before the [c]ourt is not whether plaintiffs will ultimately be successful in demonstrating a causal connection between the public disclosure and the [stock] decline ... or whether they will otherwise succeed in proving damages." *Silver Wheaton*, 2017 WL 2039171, at *15. Nor must a court "decide the precise method for calculating damages." *Id.* at *14.

Instead, the Court need only "find that calculation of damages will be sufficiently mechanical that whatever individualized inquiries need occur do not defeat class certification." *Id.*; *see also Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 369 (N.D. Cal. 2024) ("[A]ll the plaintiffs must do at the class certification stage is propose a damages methodology that will be able to reliably calculate damages in a manner common to the class at trial."). To meet that burden, "plaintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof so long as the district court finds, by a preponderance of the evidence, that the model will be able to reliably calculate damages in a manner common to the class at trial." *Alphabet*, 833 F. Supp. 3d at 1046; *see also Silver Wheaton*, 2017 WL 2039171, at *15 (expert report that "sets forth a proposal for how damages might be calculated on a classwide basis ... is sufficient to meet plaintiffs' burden").

Professor Gelbach has confirmed that damages here can be calculated classwide using a well-accepted technique. *See* Ex. 1 § VII. He proposes using the "out-of-pocket" damages method, employing an event study. *Id.* ¶¶97-102. Courts

routinely describe this method as "well-accepted" and the "standard measurement of damages in Section 10(b) securities cases." *Alphabet*, 833 F. Supp. 3d at 1046; *Weston*, 348 F.R.D. at 368 ("The out-of-pocket method of damages calculation is common for § 10(b) actions like this one."). In fact, nearly 40 courts in the Ninth Circuit have held that the out-of-pocket methodology proposed here satisfies *Comcast*. *See* Ex. 5 (chart of cases). The out-of-pocket method calculates investor damages formulaically as follows: "the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale (or the end of the Class Period, for shares retained that long)." Ex. 1 ¶117. This methodology also tracks Lead Plaintiff's theory of liability, because it measures only artificial inflation attributable to Defendants' misstatements, and this measurement is based on the abnormal stock price declines on the two corrective disclosures at issue in this case. *See City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act."); *Junge*, 2022 WL 1002446, at *6 (collecting cases); *SEB Inv.*, 2025 WL 1243818, at *8 (same).

Once the amount of artificial inflation is calculated, it can be mechanically applied to each Class member's trading data to calculate damages. *See* Ex. 1 ¶¶122-23 (explaining that the only individualized information necessary is basic trading data available via objective trading records). As the Ninth Circuit explained in *Blackie*, "we are confident that should the [Section 10(b)] class prevail the amount of price inflation during the period can be charted and the process of computing individual damages will be virtually a mechanical task." 524 F.2d at 905; *see also Silver Wheaton*, 2017 WL 2039171, at *15 ("Damages for every class member can be mechanically calculated according to [expert's] proposed [event study] methodology and are therefore subject to class wide proof.").

**2. Class Adjudication is Superior to Other Available Methods**

Rule 23(b)(3) also requires the Court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "A class action may be superior where 'class-wide litigation of common issues will reduce litigation costs and promote greater efficiency.'" *Silver Wheaton*, 2017 WL 2039171, at *16 (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)). "District courts have consistently recognized that the common liability issues involved in securities fraud cases are ideally suited for resolution by way of a class action." *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 641 (C.D. Cal. 2009) (collecting cases); *Borteanu*, 348 F.R.D. at 261 (same). The court considers four factors: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." *Silver Wheaton*, 2017 WL 2039171, at *16 (citing Rule 23(b)(3)).

Each factor favors certification. *First*, "no individual member of the Class has expressed interest in controlling the prosecution of the case, nor has anyone brought an individual suit." *Pino*, 830 F. Supp. 3d at 1026. *Second*, there is no other litigation against these Defendants asserting direct claims under the Exchange Act. *Third*, it is appropriate to concentrate the litigation in this forum "given the [c]ourt's familiarity with the claims" and because Skyworks "maintains its principal executive offices within this District." *In re STEC Inc. Sec. Litig.*, 2012 WL 6965372, at *11 (C.D. Cal. Mar. 7, 2012). *Fourth*, managing the case as a class action presents no particular difficulties. *Cooper*, 254 F.R.D. at 642. "[A] class proceeding, rather than what could be hundreds or even thousands of individual actions, will be far more efficient and will thereby reduce litigation costs and promote greater efficiency." *Katz v.*

*China Century Dragon Media, Inc.*, 287 F.R.D. 575, 589 (C.D. Cal. 2012).

**C. Bernstein Litowitz Should Be Appointed Class Counsel**

Lead Plaintiff also respectfully requests that the Court appoint Bernstein Litowitz as Class Counsel. In appointing Class Counsel, the Court must consider: (i) counsel's work; (ii) counsel's experience in handling, among other things, class actions and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). Lead Counsel satisfies the Rule 23(g) criteria. Under Lead Plaintiff's supervision, Lead Counsel has investigated the claims, drafted a detailed amended complaint, successfully opposed Defendants' Motion to Dismiss, and is conducting fact discovery with the assistance of experts. Bernstein Litowitz has substantial experience prosecuting complex securities class actions, including in this Court, and will continue to devote the resources necessary to represent the Class. Ex. 4.

**D. Defendants' Anticipated Defenses Fail**

**1. There is a Unified Class Period**

Lead Plaintiff understands that, as an alternative to seeking denial of class certification, Defendants intend to argue that the Class must be split into two classes: a class relating to the iPhone 16 alleged misstatements (which we understand Defendants contend should run from August 7, 2023 to April 30, 2024) and a class relating to the iPhone 17 alleged misstatements (which we understand Defendants contend should run from November 12, 2024 to February 5, 2025).

That argument fails because it disregards the central theory of Plaintiff's case: Defendants engaged in a continuous course of deception about Skyworks's commercial relationship with Apple, first assuring investors that Skyworks's content position was secure and that there were no material issues with the Company's relationship with Apple; then attempting to minimize the revelation of content losses in April 2024 as a one-time aberration; then assuring investors once again that the

commercial "back and forth" with Apple was "always going our way"; and finally being forced to disclose even greater content losses in February 2025. On that theory, the two disclosure events in April 2024 and February 2025 do not fracture the Class but instead reflect successive revelations of the same course of alleged misconduct.

Courts have routinely denied similar requests to divide a class into sub-classes at class certification, particularly where discovery is incomplete. For example, in *S. Ferry LP No. 2 v. Killinger*, the court rejected defendants' argument that there were two separate frauds where "the nub of the [c]omplaint" were allegations suggesting "an ongoing course of action." 271 F.R.D. 653, 656, 660-61 (W.D. Wash. 2011) (rejecting argument of "separate" frauds requiring subclasses at certification stage). Likewise, in *Sayce v. Forescout Techs., Inc.*, the court declined to split the class period into two subclasses where the plaintiff advanced a unitary theory of liability, holding that it was inappropriate to "engage in free-ranging merits inquiries" at class certification. 754 F. Supp. 3d 878, 895-99 (N.D. Cal. 2024) (noting that the defendants' challenges were centered on loss causation and damages issues that need not be analyzed at the class certification stage); *see also Blackie*, 524 F.2d at 902 ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit."); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 579 (N.D. Cal. 2009) (rejecting argument of splitting overlapping fraud into two subclasses); *In re Cendant Corp. Litig.*, 182 F.R.D. 476, 479 (D.N.J. 1998) (declining to create subclasses where defendant's "misconduct … is part of the same continuing course of conduct").

Finally, fracturing the Class is not only legally inappropriate, but it would create substantial and costly practical problems. Presumably, this approach would

require two separate and costly notice programs, one to each subclass. And investors who are members of both subclasses, like Lead Plaintiff, would receive two notices, causing confusion, and would be required to submit two separate proofs of claims to claims administrators—again, increasing expense and burden. Presumably, there would also be two sets of summary judgment motions and two trials. These circumstances provide an additional reason to deny the subclass request. As this Court has recognized, "[c]reating subclasses would create needless confusion when class notice is disseminated," and it would not be "the best way to manage this action"; any disputed factual issues may be resolved by the jury. *Petrie*, 308 F.R.D. at 359.[2]

### 2. There is No "Conflict" Defeating Certification

Lead Plaintiff understands that Defendants will argue that, depending on when class members bought and sold stock, some class members may have conflicting interests in maximizing or conversely minimizing the inflation present in the stock at various points in the Class Period. This is an argument that could be made in virtually any securities class action and is commonly rejected.

Over fifty years ago, the Ninth Circuit rejected the argument that "the interests of class members in proving damages from price inflation (and hence the existence and materiality of misrepresentations subsumed in proving inflation) irreconcilably conflict, because some class members will desire to maximize the inflation existing on a given date while others will desire to minimize it." *Blackie*, 524 F.2d at 908-10. The "possible creation of potential conflicts" in determining the appropriate measure of damages "does not render the class inappropriate now." *Id.* at 909

[2] At a bare minimum, the request to subclass is premature. *See Twitter Inc.*, 326 F.R.D. at 625 (stating that because "the [c]ourt retains the power to modify the class definition at a later stage in the proceedings," the "[d]efendants may renew their request at a later stage, after discovery is complete"); *Buttonwood Tree Value Partners, LP v. Sweeney*, 2013 WL 12125980, at *15 (C.D. Cal. Sept. 12, 2013) (holding request for subclasses was "premature").

(holding that any conflict "is peripheral, and substantially outweighed by the class members' common interests," as "[e]very class member shares an overriding common interest in establishing the existence and materiality of misrepresentations"). That is true even if there are "interim corrective disclosures," which do not create a conflict between purchasers at different stages because "both share an interest in maximizing overall inflation." *Id.* at 910.

Consistent with *Blackie*, this Court has recognized that, despite such potential conflicts, "courts regularly certify class actions in such cases on the grounds that the potential conflicts pertain only to damages," because "the conflict, if any, is peripheral and substantially outweighed by the class members' common interests." *In re Med. Cap. Sec. Litig.*, 2011 WL 5067208, at *9 (C.D. Cal. July 26, 2011) (Carter, J.) (any potential "intra-class conflicts" do not defeat certification, but rather may be "taken care of at the damages stage"); *S. Ferry LP No. 2*, 271 F.R.D. at 660-61 (stating that the Ninth Circuit "does not favor denial of class certification on the basis of speculative conflicts" and that if any intra-class "differences later appear significant, the [c]ourt can accommodate the divergent interests through the division of the above defined class into *subclasses*"); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 341 F.R.D. 542, 548-49 (S.D.N.Y. 2022) (rejecting similar conflict argument).

## IV. CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (i) certify this Action as a class action pursuant to Federal Rule of Civil Procedure 23 as described herein; (ii) appoint Lead Plaintiff as Class Representative; and (iii) appoint Bernstein Litowitz as Class Counsel.

Dated: November 13, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*

John Rizio-Hamilton (admitted *pro hac vice*)
johnr@blbglaw.com
Robert Kravetz (admitted *pro hac vice*)
robert.kravetz@blbglaw.com
Abygail Kritta (admitted *pro hac vice*)
abygail.kritta@blbglaw.com
Julissa Ramirez (*pro hac vice* pending)
julissa.ramirez@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund and the proposed class*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund, certifies that this brief is 25 pages, which complies with the page limit set by Judge Carter's Procedures.

November 13, 2026

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton